283 P.3d 60

Paulette Ka'anohiokalani KALEIKINI, Petitioner/Plaintiff–Appellant,

v.

Wayne YOSHIOKA, in his official capacity as Director of the City and County of Honolulu's Department of Transportation Services; City and County of Honolulu; Honolulu City Council; Peter Carlisle, in his official capacity as Mayor; City and County of Honolulu Department of Transportation Services; City and County of Honolulu Department of Planning and Permitting; William J. Aila, Jr., in his official capacity as Chairperson of the Board of Land and Natural Resources and state historic preservation officer; Pua'alaokalani Aiu, in her official capacity as administrator of the State Historic Preservation Division; Board of Land and Natural Resources; Department of Land and Natural Resources; Neil Abercrombie, in his official capacity as Governor; and O'ahu Island Burial Council, Respondents/Defendants–Appellees.

No. SCAP–11–0000611.

Supreme Court of Hawai'i.

Aug. 24, 2012.

David Kimo Frankel and Ashley K. Obrey, for petitioner.

William J. Wynhoff, for State respondents.

Robert C. Godbey, Don S. Kitaoka, Gary Y. Takeuchi, John P. Manaut and Lindsay N. McAneeley, for City respondents.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., Circuit Judge BROWNING, in place of ACOBA, J., Recused, and Circuit Judge TO'OTO'O, in place of DUFFY, J., Recused.

Opinion of the Court by
RECKTENWALD, C.J.

Paulette Ka'anohiokalani Kaleikini is a native Hawaiian who engages in traditional and customary practices, including the protection of native Hawaiian burial remains, or iwi. She is a recognized cultural descendant of the iwi found in Kaka'ako. Kaleikini's traditional and customary practices involve protecting iwi from disturbance or relocation, and ensuring that iwi receive proper care and respect.

Kaleikini brought this suit against the City and County of Honolulu[1] and the State of Hawai'i,[2] challenging the approval of the Honolulu High–Capacity Transit Corridor Project (rail project or project). The rail project involves the construction of an approximately 20–mile fixed guideway rail system from West O'ahu to Ala Moana Center. Construction on the rail project is planned to take place in four phases: Phase 1 (East Kapolei to Pearl Highlands), Phase 2 (Pearl Highlands to Aloha Stadium), Phase 3 (Aloha Stadium to Middle Street), and Phase 4 (Middle Street to Ala Moana Center). It is undisputed that the rail project has a "high" likelihood of having a potential effect on archeological resources in certain areas of Phase 4, which includes Kaka'ako.

Kaleikini argued that the rail project should be enjoined until an archaeological inventory survey, which identifies and documents archaeological historic properties and burial sites in the project area, is completed for all four phases of the project. More specifically, Kaleikini argued that Hawai'i Revised Statutes chapters 6E, 343, and 205A, and their implementing rules, require that an archaeological inventory survey be completed prior to any approval or commencement of the project. Kaleikini asserted that the failure to complete an archaeological inventory survey prior to the start of construction jeopardized the integrity of native Hawaiian burial sites by foreclosing options such as not building the rail, changing its route, or using a technology that would have less impact on any sites.

The City moved to dismiss Kaleikini's complaint and/or for summary judgment, and the State joined in the motion. The City acknowledged that an archaeological inventory survey was required for each phase of the rail project. However, the City asserted that a plan for completion of the archaeological inventory surveys for each phase of the project was set forth in the project's Programmatic Agreement, and that the Programmatic Agreement would ensure that the requirements of HRS chapter 6E were complied with prior to the commencement of construction in any given phase. In other words, the City and State contended that as long as an archeological inventory survey had been completed for a particular phase, construction could begin on that part of the project even if the surveys for the other

---

1. The City defendants are: Wayne Yoshioka, in his official capacity as Director of the City and County of Honolulu's Department of Transportation Services; the City and County of Honolulu; the Honolulu City Council; Peter Carlisle, in his official capacity as Mayor of the City and County of Honolulu; the City and County of Honolulu Department of Transportation Services; and the City and County of Honolulu Department of Planning and Permitting.

2. The State defendants are: William J. Aila, Jr., in his official capacity as Chairperson of the Board of Land and Natural Resources (BLNR) and state historic preservation officer; Pua'alaokalani Aiu, in her official capacity as administrator of the State Historic Preservation Division (SHPD); the BLNR; the Department of Land and Natural Resources (DLNR); Neil Abercrombie, in his official capacity as Governor of the State of Hawai'i; and the O'ahu Island Burial Council (OIBC). However, Kaleikini explained in her complaint that the OIBC was named as "an interested party," whose interests were "more properly aligned with [Kaleikini]." Accordingly, reference to the State in this opinion does not include the OIBC.

phases had not yet been completed. Based on the provisions of the Programmatic Agreement, the City argued that Kaleikini could not demonstrate a violation of HRS chapter 6E. Additionally, the City argued that neither HRS chapter 343 nor chapter 205A require the completion of an archaeological inventory survey.

The Circuit Court of the First Circuit granted summary judgment in favor of the City and State on all of Kaleikini's claims.[3] Kaleikini appeals from the circuit court's August 8, 2011 final judgment in favor of the City and the State.[4] As in the circuit court, Kaleikini's primary argument on appeal is that HRS chapters 6E, 343, and 205A require the completion of an archaeological inventory survey prior to approval of the project and commencement of construction.

HRS chapter 6E is Hawaii's historic preservation law. The Department of Land and Natural Resources, through its State Historic Preservation Division (SHPD), is the agency tasked with promulgating the rules to carry out this law, and with implementing these rules.

In the instant case, the SHPD failed to follow its own rules when it concurred in the rail project prior to the completion of an archaeological inventory survey for the entire project. As explained below, the rules establish a sequential process under which an archaeological inventory survey must precede the SHPD's concurrence in a project. As noted in the rules, "[t]he review process is designed to identify significant historic properties in project areas *and then* to develop and execute plans to handle impacts to the significant properties in the public interest." HAR § 13–275–1(a) (emphasis added). Moreover, the broad definition of the term "project area" contained in the rules encompasses the entire rail project, and does not permit the SHPD to consider the rail project in four separate phases for the purposes of historic preservation review.

In contrast to the requirements of the rules, the rail project's Programmatic Agreement provides for the completion of archaeological inventory surveys *after* the SHPD has provided its concurrence in the project. Nevertheless, the City and State have argued that the Programmatic Agreement constitutes an "interim protection plan," which would allow the rail project to commence absent completion of the full historic preservation review process. Although the City and State are correct that the rules permit a project to commence where an "interim protection plan" is in place, a plain reading of the rules indicates that the Programmatic Agreement is not an interim protection plan. When viewed in context, it is apparent that an interim protection plan is a form of mitigation that, under the sequential approach of the rules, can be developed only after an AIS has been completed.

In sum, the SHPD failed to comply with HRS chapter 6E and its implementing rules when it concurred in the rail project prior to the completion of the required archaeological inventory survey for the entire project. The City similarly failed to comply with HRS chapter 6E and its implementing rules by granting a special management area permit for the rail project and by commencing construction prior to the completion of the historic preservation review process.

Accordingly, we vacate the circuit court's judgment on Counts 1 through 4 of Kaleikini's complaint, which challenged the rail project under HRS chapter 6E, and remand to the circuit court for further proceedings on those counts. We affirm the circuit court's judgment in all other respects.

# I. Background

## A. Rail project

The following facts are undisputed. The rail project involves the construction of an

---

3. The Honorable Gary W.B. Chang presided.

4. Kaleikini also seeks review of the following: (1) the circuit court's July 5, 2011 order granting summary judgment in favor of the City; (2) the circuit court's July 5, 2011 order granting the State's substantive joinder in the City's motion to dismiss and/or for summary judgment; (3) the circuit court's July 5, 2011 order denying Kaleik-

ini's motion for reconsideration of the court's oral rulings granting the City's motion to dismiss and/or for summary judgment, and the State's motion for substantive joinder; and (4) the circuit court's oral ruling denying Kaleikini's Hawai'i Rules of Civil Procedure (HRCP) Rule 56(f) request for additional time to pursue discovery.

approximately 20–mile fixed guideway rail system from West Oʻahu to Ala Moana Center. Construction on the rail project is planned to take place in four phases: Phase 1 (East Kapolei to Pearl Highlands), Phase 2 (Pearl Highlands to Aloha Stadium), Phase 3 (Aloha Stadium to Middle Street), and Phase 4 (Middle Street to Ala Moana Center).

The rail project's final Environmental Impact Statement (EIS) was completed in June 2010. The EIS indicates that four alternatives for the rail project were considered: (1) the No Build Alternative; (2) the Transportation System Management Alternative; (3) the Managed Lane Alternative; [5] and (4) the Fixed Guideway Alternative. The EIS concluded that the Fixed Guideway Alternative "performed better at meeting the Project's Purpose and Need than any of the other alternatives" and "would improve transit performance and reliability[.]"

The EIS noted that three fixed guideway alternatives were considered: the Salt Lake Alternative, the Airport Alternative, and the Airport & Salt Lake Alternative. All three alternatives would involve the same route through Dillingham, Downtown, and Kakaʻako. The Airport Alternative was ultimately chosen as the preferred alternative.

The EIS indicated that the rail project has a "[h]igh" likelihood of having a potential effect on archeological resources in certain areas of Phase 4, including Dillingham, Downtown, and Kakaʻako. With regard to the need for an archaeological inventory survey (AIS), the EIS stated:

> The City will develop an [AIS] plan for the [area of potential effects] for each construction phase in accordance with [36 C.F.R. § 800.4 [6]] which allows for phased identification of archaeological resources to limit disturbance of potential resources during the investigation.... The AIS plans will follow the requirements of [Hawaiʻi Administrative Rules (HAR) chapter 13–276.[7]] The City will conduct the archaeological fieldwork as presented in the AIS plan for each construction phase. The archaeological fieldwork will be completed in advance of the completion of the final design so that measures to avoid and/or minimize adverse effects to the historic properties can be incorporated into the design. The City has consulted and continues to consult with SHPD and OIBC on burial issues.... To balance the current level of project design, the desire to limit disturbance of native Hawaiian burials and residences in Phase [4] of the project area, and the potential transportation benefits that would accrue from the proposed project, FTA, in consultation with the parties,

---

**5.** The EIS stated that the No Build Alternative "remains under consideration as a viable option." The EIS concluded that the Transportation System Management Alternative, which involved a bus-based alternative, involved fewer benefits than the other alternatives and raised concerns regarding financial feasibility. The EIS further concluded that the Managed Lane Alternative, which involved a two-lane elevated toll facility between Waipahu and Downtown, would provide very little transit benefit at a high cost.

**6.** 36 C.F.R. § 800.4 (2010) concerns the identification of historic properties under federal law, and provides, in pertinent part:

> *Phased identification and evaluation. Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts. The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, a programmatic agreement executed pursuant to § 800.14(b), or the docu-*

> *ments used by an agency official to comply with the National Environmental Policy Act pursuant to § 800.8. The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of the [State Historic Preservation Officer/Tribal Historic Preservation Officer] and any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.*

36 C.F.R. § 800.4(b)(2) (emphasis added).

As discussed more fully below, the rules implementing Hawaii's historic preservation law do not include a similar provision.

**7.** HAR chapter 13–276 contains the rules governing standards for AISs and AIS reports.

decided to develop a detailed approach in the .... draft PA for conducting archaeological investigations for Phase [4] of the project. The City has committed to conducting archaeological investigations in locations where foundations will be placed. This would limit the area disturbed for archaeological investigations and construction to potentially less than 10 percent of what would be disturbed if archaeological investigations were conducted for 100 percent of the alignment. The City's proposed schedule for the Project would have construction starting in 2013 for Phase [4] (in the Kakaʻako neighborhood). Although, the development of more detailed design and, therefore, archeological investigations for the last construction phase would have typically been delayed until closer to the anticipated construction start date, the City has committed to starting the process much earlier.

A draft Programmatic Agreement (PA) was appended to the final EIS, which described the "archaeological historic property and resource identification and evaluation effort, as well as the mitigation procedures for identified archaeological resources." The EIS indicated that the draft PA was developed to conform with "Section 106 of the National Historic Preservation Act." The PA was developed in consultation with, inter alia, the SHPD.

The final PA was executed on or before January 18, 2011. Aila, as Hawaiʻi State Historic Preservation Officer, was a signatory to the final PA. OIBC declined to sign the PA. The PA provides for a "phased approach to identification and evaluation of archaeological resources, under which an AIS must be completed, and the results approved by the SHPD, for each construction Phase before ground-disturbing activity in that Phase can commence." Accordingly, a single AIS for the whole project will not be performed.

Once an AIS for a given phase is completed and the results approved by the SHPD and, where necessary, the OIBC, construction on that phase may begin, even if the AISs for the remaining phases are not yet complete.

The PA provides that archeological fieldwork will be completed for each phase prior to the final design and construction of that phase. The fieldwork shall include, but is not limited to, reconnaissance surveys by way of archival research and visual inspection, a sample survey of subsurface conditions with ground-penetrating radar, subsurface inspection as warranted, and subsurface testing. Any native Hawaiian burials, or "iwi kupuna," discovered during the AIS for each phase will be treated as "previously identified" burials, and the OIBC will therefore have jurisdiction to determine the treatment of these burials pursuant to HAR chapter 13–300.[8]

The PA requires the City to develop a plan for the AIS process prior to archaeological fieldwork being performed. With regard to Phase 4, the PA provides that the City must consult with the OIBC, lineal and cultural descendants, native Hawaiian organizations, and other interested parties within sixty days of the execution of the PA regarding the scope of the investigation for the AIS plan. "The AIS Plan will provide for investigation of the entire Phase 4 area" and will "evaluate all areas that will be disturbed by the Project." The final PA provides that the AIS plan is to be submitted to the SHPD for comment, and then returned to the City to revise the AIS plan. "Archaeological investigation will begin following approval of the AIS Plan by the SHPD." In addition, the final PA required that the City (1) complete the AIS for Phase 4 prior to beginning final design for that area; (2) inform the OIBC of the status of the AIS and continue to meet regularly with the OIBC; and (3) in coordination with the OIBC, lineal and cultural

---

8. HAR § 13–300–31(b) (1996) provides that "[b]urial sites discovered during archaeological inventory surveys that appear to be over fifty years old shall be classified as previously identified for which the [island burial council] or [DLNR], whichever is applicable, shall determine appropriate treatment."

HAR § 13–300–3(b) (1996) provides that the "[a]uthority to determine treatment of any burial site belongs to the [DLNR], following appropriate consultations, *except that where a burial site is Native Hawaiian and previously identified, authority to determine treatment belongs to the appropriate [island burial] council.*" (Emphasis added).

descendants, native Hawaiian organizations, and other interested persons, complete a draft protocol for consultation regarding treatment of any iwi kupuna identified during the AIS.

With regard to treatment plans, the final PA provided:

> Based on the results of the AIS fieldwork and in consultation with the SHPD, the City shall develop a specific treatment plan to avoid, minimize, or mitigate adverse effects on historic properties including archaeological sites and burials pursuant to applicable state laws ... for each construction phase. Treatment plans shall be submitted to the SHPD for approval. Upon approval by the SHPD, the City shall implement the treatment plan.

Additionally,

> The City confirms that guideway columns may be relocated a limited distance along the guideway at most column locations, straddle-bent supports may be used, or special sections developed to modify span length allowing for preservation in-place to be viable in those locations. If the OIBC determines that a burial is to be relocated, the City will consult with the OIBC to determine appropriate reinterment, which may include relocation to Project property in the vicinity of the discovery.

An AIS for Phase 1 has been completed and was approved by the SHPD on April 19, 2010. The final PA required that the AIS process for Phase 4 begin within sixty days

of the execution of the PA. However, the circuit court record does not contain further information with regard to the progress or completion of any other AIS.[9]

## B. Circuit court proceedings

### 1. Complaint

On January 31, 2011, Kaleikini filed a complaint for declaratory and injunctive relief seeking to delay the start of construction on the rail project, and naming the City and State, as well as the OIBC, as defendants.[10] Kaleikini asserted that she is a native Hawaiian who engages in native Hawaiian traditional and customary practices, including "[p]rotection of iwi in place and prevention of relocation[,]" and "ensur[ing] that iwi remain undisturbed and that they receive proper care and respect." She further asserted that she is a recognized cultural descendant of the iwi found in Kakaʻako.[11] She alleged that an AIS for the entire rail project corridor would allow her to "better ensure the appropriate protection of iwi." She further asserted that she provided comment and testimony on the draft EIS and special management area permit for the project, wherein she opined that an AIS was needed for the entire project prior to decision making on the project.

Kaleikini's complaint alleged six counts. First, Kaleikini alleged that the City's grant of a special management area permit for the rail project and its decision to commence construction on the project prior to the completion of an AIS violated HRS §§ 6E–8[12]

9. In documents attached to the City's opposition to Kaleikini's Motion for Injunction Pending Appeal, which this court denied on April 4, 2012, the City asserted that (1) an AIS was completed for Phase 1, with no burial sites found; (2) AIS fieldwork for Phase 2 is completed, with no burial sites found; (3) AIS fieldwork for Phase 3 was expected to be completed in June 2012; and (4) AIS fieldwork for Phase 4 was expected to be completed in November 2012. The City further asserted that groundbreaking work on Phase 4 will not commence until March 2015. The City also asserted that the AIS for Phase 4 was already underway and that no burials had yet been discovered.

10. *See* supra n. 1 and 2.

11. "Cultural descendant" means, "with respect to Native Hawaiian skeletal remains, a claimant recognized by the [island burial] council after

establishing genealogical connections to Native Hawaiian ancestors who once resided or are buried or both, in the same ahupuaʻa or district in which certain Native Hawaiian skeletal remains are located or originated from." HAR § 13–300–2 (1996).

12. HRS § 6E–8 (2009) provides, in pertinent part:

> **Review of effect of proposed state projects.** (a) Before any agency or officer of the State or its political subdivisions commences any project which may affect historic property, aviation artifact, or a burial site, the agency or officer shall advise the department and allow the [DLNR] an opportunity for review of the effect of the proposed project on historic properties, aviation artifacts, or burial sites, consistent with section 6E–43, especially those listed on

and 6E–42,[13] and their implementing rules, HAR chapters 13–275 (2002) and 13–284 (2002) (Counts 1–2). Kaleikini further alleged that the DLNR, through the SHPD, violated HRS §§ 6E–8 and 6E–42, and their implementing rules, in authorizing an AIS to be postponed (Counts 3–4). Kaleikini also alleged that Governor Abercrombie violated HRS chapter 343 by accepting the final EIS for the rail project, because the final EIS did not contain an AIS and was therefore incomplete (Count 5). Finally, Kaleikini alleged that the City and State Defendants had failed to "give full consideration of the impact of the [rail project] on iwi and cultural and historic values prior to decisionmaking" (Count 6).

Based on the foregoing, Kaleikini sought (1) a declaration that the City and DLNR violated HRS §§ 6E–42 and/or 6E–8; (2) a declaration that an AIS must be prepared for the rail project prior to "decisionmaking on the project and/or commencement"; (3) a declaration that the final EIS was "unacceptable" because it did not include an AIS; (4) a declaration voiding "any and all state or county permits or approvals" for the rail project; (5) an order prohibiting the City from commencing or continuing any "ground disturbance" prior to completion of an AIS and historic preservation review process; (6) an injunction prohibiting the City from "engaging in any land alteration" prior to the completion of an AIS and historic preservation review process; (7) an order compelling the SHPD to fulfill its obligations under HRS

chapter 6E; (8) attorney's fees under the private attorney general doctrine; and (9) any other relief deemed just and proper by the court.

## 2. Motion for preliminary injunction

Kaleikini filed a motion for preliminary injunction, seeking to prevent the City from "commencing, or continuing, any ground disturbance or land alteration" in support of the rail project. In support of her motion, Kaleikini submitted a declaration in which she declared, in pertinent part:

3. As a Native Hawaiian, I engage in various traditional and customary practices that my parents and other ancestors taught me.

4. One of the critical tenets of Native Hawaiian traditional and customary practices is the obligation to ensure that *'iwi* . . . remain undisturbed; and that they receive proper care and respect. Protection of *'iwi* in place and prevention of relocation is a traditional and customary practice of Native Hawaiians who inhabited the Hawaiian Islands prior to 1778.

5. One of the most important Native Hawaiian traditional and customary practices that I engage in is to *malama* burial sites *na 'iwi kūpuna.* I visit burial sites to ensure that they are clean (although not necessarily marked). I ensure that these sites are not disturbed. I do *pule* at burial sites. [ [14]]

the Hawaii register of historic places. The proposed project shall not be commenced, or in the event it has already begun, continued, until the department shall have given its written concurrence. The department is to provide written concurrence or non-concurrence within ninety days after the filing of a request with the department. The agency or officer seeking to proceed with the project, or any person, may appeal the department's concurrence or non-concurrence to the Hawaii historic places review board. An agency, officer, or other person who is dissatisfied with the decision of the review board may apply to the governor, who may request the Hawaii advisory council on historic preservation to report or who may take action as the governor deems best in overruling or sustaining the department.

13. HRS § 6E–42 (2009) provides, in pertinent part:

**Review of proposed projects.** (a) Before any agency or officer of the State or its political subdivisions approves any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, which may affect historic property, aviation artifacts, or a burial site, the agency or office shall advise the department and prior to any approval allow the department an opportunity for review and comment on the effect of the proposed project on historic properties, aviation artifacts, or burial sites, consistent with section 6E–43, including those listed in the Hawaii register of historic places.

14. "Malama" means "[t]o take care of, tend, attend, care for, preserve, protect, beware, save [or] maintain[.]" Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 232 (1986). "Pule" means, inter alia, "prayer" or "blessing." *Id.* at 353.

6. The [OIBC] has officially recognized me as a cultural descendant of iwi found in Kaka'ako.

7. The unnecessary removal of iwi causes me great pain and suffering.

8. I rely on information contained in archaeological inventory surveys to advocate for the protection of iwi.

9. Although the law may not allow me to unilaterally decide the fate of ancestral remains, I have filed this action to ensure that all proper procedures are followed for the [rail project], which will impact iwi.

10. An [AIS] along the entire corridor of the [rail project] would help me meet my kuleana to ensure the appropriate protection of iwi.

11. Every act of uncovering burial remains is an alteration of a burial site.

. . . .

34. I am familiar with burials being buried in Kaka'ako. For example, I helped wrap iwi of twenty-five kupuna (from coffins and unmarked) at the Queen Street extension project; twenty-seven burials at Kewalo Development (Alexander and Baldwin); sixty-three burials at the Wal–Mart site on Ke'eaumoku Street; as well as over sixty burials at Ward Villages (General Growth Properties).

35. The planned rail corridor runs through this same general area.

The OIBC filed a statement of position regarding Kaleikini's motion, stating as follows:

In accordance with its duties and responsibilities, the OIBC set forth its significant concerns over the planned rail project by letter dated October 18, 2009. Those concerns include concerns over the phased [AIS] approach to the project. . . . The OIBC has also repeatedly raised in OIBC meetings its understanding that the [PA] for the city's rail project does not exempt the city from historic preservation responsibilities set forth in HRS [c]hapter 6E and its associated administrative rules, which do not allow for phased [AISs] that

occur after or simultaneously with approval and construction of a project.

Accordingly, Defendant OIBC respectfully requests that the court weigh these concerns and strongly consider [Kaleikini's] motion for preliminary injunction.

(Record citations omitted).

The OIBC also submitted the minutes of its April 14, 2010 meeting, in which the OIBC determined that it did not support a phased approach to the AIS. The OIBC also submitted a copy of an October 18, 2009 letter it sent to the U.S. Department of Transportation concerning the rail project. The letter noted "a gross lack of consultation" between the City and the OIBC between 2005, when the City initiated consultation with OIBC, and July 9, 2008, when the OIBC requested that City representatives appear before the OIBC to update the OIBC on the project.

The letter also described the OIBC's concerns with the draft PA. The OIBC noted a "significant divide . . . between the City's and the OIBC's perspective regarding how to 'best protect iwi kupuna.' " Specifically, the OIBC stated that "[t]he OIBC's view focuses on early identification of iwi kupuna to facilitate a strategy of avoidance through the consideration of alternate alignments[,]" while "[t]he City's view focuses on early commitment to a given alignment and later identification of iwi kupuna, employing a strategy of mitigating the negative impacts on iwi kupuna through design changes in the designated corridor." The OIBC also explained "[r]elevant Hawaiian [c]ultural [p]erspectives" regarding burials as follows:

The act of burial and burial locations were kept huna (secret and hidden). Burials were kapu[ [15]], intended to be left in peace, and carefully guarded to ensure that no disturbance occurred. Intrusions into burials (opening up the ground to expose iwi kūpuna, touching iwi kupuna, uprooting iwi kūpuna, etc.) was considered extremely offensive and disrespectful-an act of violence and degradation directed at the deceased individual, the living family members, and

---

15. "Kapu" means, inter alia, "forbidden" or "sacred, holy, consecrated[.]" Pukui & Elbert at

132.

the larger community associated with that burial. Such an act would be akin to disrobing a living person and physically handling them against their will.

The City and State opposed Kaleikini's motion. Attached to the City's opposition was a declaration by Pua'alaokalani Aiu, Administrator of the SHPD. Aiu declared that she was involved in the consultation process that resulted in the execution of the PA for the rail project. Aiu further stated that, because the rail project will have an effect on historic properties, Section 106 of the National Historic Preservation Act of 1966 was applicable. "Pursuant to this Act, there was a consultation process to address ways to minimize, mitigate, or avoid effects to historic resources under state law during the construction of the Project. The PA is the outcome of that process."

Aiu acknowledged that the SHPD must have an opportunity to "review and comment on the effect of the Project on historical properties or burial sites" as required under HRS § 6E–8. Aiu stated that an "extensive consultation" process had taken place between the SHPD and the City's Department of Transportation Services. Specifically, Aiu noted that consultants had prepared "a series of extensive archaeological, historical and cultural technical reports related to historic properties, and also consulted with SHPD[.]" Aiu stated that the technical reports "provided extensive cultural, historical and archaeological data that served as a basis for developing a plan for identifying historic properties that may be impacted by the Project, including archaeological and burial sites." Aiu further declared:

10. It is SHPD's position that neither HRS § 6E–8 nor HRS § 6E–42 requires the completion of an [AIS] for the entire project prior to SHPD's approval of the plan set forth in the PA.

. . . .

13. The PA is SHPD's written concurrence to the phased construction approach, as required by [HRS] § 6E–8 and HAR § 13–275–3.

. . . .

15. SHPD considered the likely impacts of the Project on historic properties, including subsurface archaeological and burial sites.

16. SHPD has determined that the appropriate way to address and mitigate these potential impacts is as set out in the PA.

. . . .

23. It is SHPD's position that this phased approach to identification and handling of archeological resources provided for in the PA, satisfies the historic preservation review process set forth under Chapter 6E and its regulations.

A copy of an August 15, 2008 Archaeological Resources Technical Report, referenced in Aiu's declaration, was also appended to the City's opposition to Kaleikini's motion. The report "identifie[d] likely impacts to archaeological resources within the archaeological study area" relating to four alternatives under consideration, i.e., No Build, Fixed Guideway (Salt Lake), Fixed Guideway (Airport) and Fixed Guideway (Airport & Salt Lake). The report stated, "[w]ith few exceptions, the archaeological resources that could be affected by the Project are subsurface features and deposits that have not been previously identified." The report identified a high likelihood of impacts to burials in the sub-areas of Dillingham, Downtown, and Kaka'ako. The report noted that previous archaeological research had been conducted along the corridor of the rail project, and described these investigations. With regard to Kaka'ako, the report noted

The area has been subject to intensive reconstruction and growth since the mid–1990s as a consequence of the growth of Honolulu and Waikīkī. Several investigations have uncovered subsurface elevated sand ridges, often containing burials in addition to other archaeological resources. These factors have led to the generation of numerous archaeological reports for the area.

With regard to further archaeological research, the report stated:

Identification of these archaeological resources beneath in-use streets, sidewalks, and highways would likely pose a signifi-

cant disruption of traffic. The cost and time requirements associated with identifying subsurface archaeological deposits beneath developed roadways and sidewalks greatly increase, because of the need to disrupt traffic, saw-cut and remove existing pavement to expose underlying sediments, search for archaeological deposits, and then repave the affected area. Additionally, the Project's potential archaeology-affecting ground disturbance would be over a large geographic area, requiring an extensive archaeological historic property/archaeological resource identification effort. Finally, the project design and engineering are still under development, and the actual footprints of the elevated guideway's support columns will not be known until after completion of the Project's Federal environmental and historic preservation reviews. Until there is certainty regarding column placement, any archaeological testing associated with the Project's archaeological historic property/archaeological resource identification effort could be outside the actual project footprint and could disturb archaeological resources that would otherwise not be disturbed by the Project. Nevertheless, to comply with the Project's State and Federal environmental and historic preservation review process, a reasonable, good faith effort was made to identify archaeological resources located within the proposed alignments and to provide sufficient information to make reasonable decisions regarding their mitigation during the Project's construction.

Kaleikini's motion was decided along with the City's motion to dismiss and/or for summary judgment, discussed *infra*.

### 3. City's motion to dismiss and/or for summary judgment

On February 9, 2011, the City filed a motion to dismiss and/or for summary judgment. The City argued that Kaleikini could not assert a private right of action to enjoin the rail project under HRS § 6E–13(b) because she had not established a "realistic threat of *irreparable injury* to any Native Hawaiian burials." (Emphasis in original). The City additionally argued that Kaleikini could not demonstrate a violation of HRS § 6E–42 or HRS § 6E–8, or their implementing rules. Specifically, the City asserted that Kaleikini could not demonstrate a violation of HRS § 6E–42 because "the required coordination, consultation, review and comment between the Project's sponsoring agencies and SHPD indisputably occurred." The City additionally asserted that the SHPD's "decision to approve the AIS plan in the PA is presumed valid under Hawaiʻi law." (Citation and emphasis omitted). Additionally, the City asserted that "burial handling issues" were considered as evidenced by City Council Resolution No. 11–7, CD1, "which expressly conditions the issuance of the [special management area] permit upon the PA and Final [EIS]." [16] The City also asserted that the PA served as an "interim protection plan" that allowed the rail project to commence. [17]

The City further asserted that Kaleikini could not demonstrate any violation of HRS § 6E–8 because the "SHPD provided formal written concurrence to the Project ... through its execution of the PA, which indis-

**16.** A "true and correct copy" of Resolution No. 11–7 was attached to the City's motion as exhibit "M." The resolution resolved to issue a special management area permit to the City's Department of Transportation Services, and provided, in pertinent part:

> Prior to the issuance of any development permit for the Project, the [Department of Transportation Services] shall provide the Director of the [Department of Planning and Permitting] with written documentation that a [PA] to minimize and mitigate adverse effects on historic properties as generally described in the Final [EIS] has been executed. The PA and any amendments thereto shall record the terms

and conditions agreed upon to resolve potential adverse effects on historic properties, and, shall include stipulations related to the encountering of any previously unidentified archaeological site or remains (such as artifacts, shell, bone, or charcoal deposits, human burials, rock or coral alignments, pavings, or walls) during construction activities.

**17.** HAR § 13–284–3 (2002) provides, in pertinent part: "In cases where interim protection plans are adequately in place *and* any data recovery fieldwork has been adequately completed, the project may commence from a historic preservation perspective." (Emphasis added).

putably serves as a permissible 'interim protection plan' for historic properties that may be impacted by the Project under HAR § 13–275–3." [18]

The City also asserted that Kaleikini could not demonstrate a violation of HRS chapter 343 because an EIS is not required to include a completed AIS. Additionally, with regard to Kaleikini's claim that the City and State failed to fully consider the impact of the rail project on native Hawaiian burials, the City noted that Kaleikini had not identified a legal basis for her claim and that, in any event, the issue was properly considered.

The City attached a declaration of Faith Miyamoto, Chief of Transit Planning and Environmental Studies at the Rapid Transit Division of the Department of Transportation Services. Miyamoto declared that:

> The PA is one way to satisfy federal requirements of Section 106 of the National Historic Preservation Act of 1966. The PA also includes a process, developed through consultation with various participating parties, including the [SHPD] of the [DLNR], for addressing the discovery of burials and other archaeological and cultural artifacts under state law during the construction of the Project.

Miyamoto further declared that, during the environmental review process, the City notified the SHPD of the project and provided it "with an opportunity to review and comment on the potential impact of the Project on historical properties, including burial sites, as required under HRS § 6E–42." Miyamoto attached numerous supporting documents to her declaration including the PA, excerpts from the draft and final EISs, and various technical reports.

A hearing on the City's motion was scheduled for March 14, 2011. The State Defendants filed a substantive joinder to the City Defendants' motion. OIBC filed a statement of no position as to the motion.

Kaleikini opposed the City's motion. Citing HRCP Rule 56(f),[19] Kaleikini sought additional time to complete discovery prior to the hearing on the motion, on the ground that it would not be possible for her to submit admissible evidence by the hearing date. Kaleikini also argued that "an AIS must precede decisionmaking and commencement of the rail project" under HRS chapter 6E. Accordingly, Kaleikini argued, the SHPD could not have properly reviewed and commented on the project or given its concurrence prior to an AIS being completed for the entire 20 mile project. Kaleikini also disputed the City's assertion that the PA could serve as an interim protection plan under the applicable rules. Rather, Kaleikini asserted, "an interim protection plan can only be approved *after* an [AIS] has been prepared." Kaleikini additionally asserted that neither the statutes nor the rules allowed for the City's phased approach to the AISs.

Kaleikini further asserted that she had made the requisite showing of an "irreparable injury" to establish a private right of action. Specifically, Kaleikini asserted that the potential for uncovering iwi constituted an irreparable injury, as did the City and State's failure to follow proper procedures under HRS chapter 6E.

Kaleikini further argued that the EIS was inadequate because it did not contain an adequate description of "resources of historic, archaeological, or aesthetic significance." (Quoting HAR § 11–200–17(G) [20]). Finally,

---

18. HAR § 13–275–3 (2002) provides, in pertinent part: "In cases where interim protection plans are adequately in place *or* data recovery fieldwork has been adequately completed, a determination letter may be issued." (Emphasis added). A "determination letter" is the "SHPD's written response which either concurs or does not concur with an agency's proposed project." HAR § 13–275–2 (2002).

19. HRCP Rule 56 governs summary judgment. HRCP Rule 56(f) (2010) provides:

> **When affidavits are unavailable.** Should it appear from the affidavits of a party opposing

the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

20. HAR § 11–200–17(G) (1996) requires that a draft EIS include a description of "environmental resources that are rare or unique to the region and the project site (including natural or human-made resources of historic, archaeologi-

Kaleikini asserted that the City and State failed to "give full consideration to cultural and historic values." (Quoting *Public Access Shoreline Hawaii v. Hawai'i Cnty. Planning Comm'n* (*PASH*), 79 Hawai'i 425, 435, 903 P.2d 1246, 1256 (1995)). Kaleikini asserted that such consideration is required under HRS § 205A–4, this court's caselaw, and the public trust principles contained in HRS chapter 6E.

Kaleikini separately filed an opposition to the State's joinder, on the same grounds articulated in her opposition to the City's motion.

A hearing on the City's motion was held on March 14, 15, and 23, 2011. At the conclusion of the hearing, the circuit court orally denied Kaleikini's HRCP Rule 56(f) request on the ground that Kaleikini had failed to show that a continuance would enable her to rebut the City's showing that there was no genuine issue of material fact and, in any event, the resolution of the City's motion raised a question of law that did not turn on any disputed facts of the case. The circuit court orally granted the City's motion for summary judgment and the State's joinder, on the ground that the phased approach to the AISs for the rail project was not prohibited by law. The circuit court also denied Kaleikini's motion for preliminary injunction as moot based on its oral ruling on the City's motion.

Kaleikini filed a motion for reconsideration of the circuit court's oral rulings. Kaleikini appended various exhibits to her motion, including declarations of Dr. Kehaulani Cachola–Abad, who has a PhD in Anthropology with a specialization in Hawaiian archaeology. Dr. Cachola–Abad opined that an AIS should be performed prior to decision making. Dr. Cachola–Abad further opined that,

> Given the number of burials that are likely to be encountered and the extent of excavation that will be required for this project, the relocation of specific piers will not likely adequately protect the burials found along the corridor. In other words, more fundamental options would need to be con-

sidered to protect the burials—including the route and the technology employed.

The circuit court denied the motion for reconsideration on July 5, 2011. The same day, the circuit court filed its order granting summary judgment in favor of the City and State, and granting the State Defendants' substantive joinder in the City's motion. On August 8, 2011, the circuit court filed its final judgment in favor of the City, State, and OIBC, and against Kaleikini on all claims.

## C. Appeal

Kaleikini filed a timely notice of appeal on August 11, 2011. On January 17, 2012, we granted Kaleikini's application for a mandatory and discretionary transfer of her appeal from the ICA to this court.

Kaleikini raises four points of error: that the circuit court erred in (1) granting the City's motion for summary judgment; (2) granting the State's substantive joinder in the City's motion; (3) denying Kaleikini's motion for reconsideration; and (4) denying Kaleikini's HRCP Rule 56(f) request. As set forth in detail below, Kaleikini's primary argument on appeal is that the City and State failed to comply with HRS §§ 6E–8 and 6E–42, and their implementing rules, by allowing a decision on the project to be made prior to the completion of an AIS for the entire project. In response, the City and State argue that the requirements of the applicable statutes and rules have been met and the process undertaken to approve the rail project was permissible for a variety of reasons, including that a phased approach to the AIS is permissible, the SHPD has discretion to consider the separate phases of the rail project as separate projects, and the PA ensures that an AIS will eventually be completed.

## II. Standards of Review

### A. Summary judgment

█ "On appeal, the grant or denial of summary judgment is reviewed de novo." *First Ins. Co. of Hawaii v. A & B Props.*, 126

cal, or aesthetic significance) [.]" A final EIS consists of, inter alia, "[t]he draft EIS revised to incorporate substantive comments received dur-

ing the consultation and review process[.]" HAR § 11–200–18.

Hawai'i 406, 413, 271 P.3d 1165, 1172 (2012) (quoting *Nuuanu Valley Ass'n v. City & Cnty. of Honolulu*, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008)).

## B. Statutory Interpretation

■ "Statutory interpretation is a question of law reviewable de novo." *Id.* at 414, 271 P.3d at 1173 (quoting *State v. Wheeler*, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009)).

## C. Interpretation of agency rules

■ In interpreting the HAR,

[t]he general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 425, 83 P.3d 664, 688 (2004) (quoting *Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 323, 713 P.2d 943, 950 (1986)).

■ An agency's interpretation of its own rules is generally entitled to deference. *Gillan v. Gov't Emps. Ins. Co.*, 119 Hawai'i 109, 125, 194 P.3d 1071, 1087 (2008) ("Arguably, where an agency promulgates a rule, we will accord consideration to its interpretation of its own rules.") (citation omitted); *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984) ("[I]n deference to the administrative agency's expertise and experience in its particular field, the courts should not substitute their own judgment for that of the administrative agency where mixed questions of fact and law are presented. This is particularly true where the law to be applied is not a statute but an administrative rule promulgated by the same agency interpreting it.") (citation omitted). However, this court does not defer to agency interpretations that are "plainly erroneous or inconsistent with the underlying legislative purpose."

*In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i at 425, 83 P.3d at 688.

## D. Acceptability of an EIS

■ In reviewing a challenge to an accepted EIS, this court "uses the 'rule of reason' to determine whether an EIS is legally sufficient in adequately disclosing facts to enable a decision-making body to render an informed decision." *Citizens for Prot. of North Kohala Coastline v. Cnty. of Hawai'i*, 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999) (brackets and citation omitted). Under the "rule of reason,"

an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*Price v. Obayashi Hawaii Corp.*, 81 Hawai'i 171, 182, 914 P.2d 1364, 1375 (1996) (citation omitted).

Additionally, "courts are reluctant to 'second guess' the decision-making body regarding the sufficiency of an EIS." *Id.* at 182 n. 12, 914 P.2d at 1375 n. 12.

## E. Denial of a request for a HRCP Rule 56(f) continuance

■ "A trial court's decision to deny a request for a continuance pursuant to HRCP Rule 56(f) will not be reversed absent an abuse of discretion." *Josue v. Isuzu Motors America, Inc.*, 87 Hawai'i 413, 416, 958 P.2d 535, 538 (1998). An abuse of discretion occurs if the trial court "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

**F. Denial of a request for reconsideration**

The appellate court reviews a "trial court's ruling on a motion for reconsideration ... under the abuse of discretion standard." *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.*, 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002) (quotation marks omitted) (quoting *Sousaris v. Miller*, 92 Hawai'i 505, 513, 993 P.2d 539, 547 (2000)).

## III. Discussion

As set forth below, Kaleikini has made a sufficient showing of irreparable injury to bring her claims under HRS chapter 6E. With regard to the merits of her claims, the rules implementing HRS §§ 6E–8 and 6E–42 require that historic properties be identified in the "project area," and the broad definition of "project area" contained in the rules encompasses the entire rail project. The rules do not permit the SHPD to concur in the rail project absent a completed AIS for the entire project area. Rather, the rules establish a sequential process under which an AIS, if required, must precede the SHPD's concurrence in a project. Because an AIS was not completed before the SHPD gave its concurrence in the rail project, the SHPD's concurrence in and the City's commencement of the project were improper. Although the State argues that the PA constituted an "interim protection plan" that permitted the SHPD to concur in the project prior to the completion of the historic preservation review process, the PA does not constitute an interim protection plan under the applicable rules. Accordingly, the circuit court erred in granting summary judgment in favor of the City and State on Counts 1 through 4 of Kaleikini's complaint.

However, the circuit court properly granted summary judgment in favor of the City and State on Counts 5 and 6 because (1) the final EIS was sufficient under HRS chapter 343 and was properly accepted by the Governor; and (2) the City and State gave full consideration to cultural and historic values as required under HRS chapter 205A.

**A. Kaleikini has made a sufficient showing of "irreparable injury" to bring her claims under HRS § 6E–13(b)**

The City argues that Kaleikini has not shown "an immediate threat of irreparable harm to a burial or other historic property[,]" which, the City argues, is required to assert a private right of action under HRS § 6E–13(b). Kaleikini asserts that she has made the requisite showing of an irreparable injury in the form of (1) a procedural injury; and (2) injury to the burials and/or her interest in protecting the burials. With regard to injury to the burials and Kaleikini's interest in protecting those burials, Kaleikini specifically asserts that there is a high likelihood of uncovering burials in Phase 4 of the project, and that the City's decision to proceed with the rail project without first completing the required historic preservation review process forecloses options that would provide greater protection to burials, including the no-build alternative, and alternative technologies or routes. As set forth below, Kaleikini has made a sufficient showing of irreparable injury in the form of threatened injury to the Kaka'ako burial sites, and accordingly has standing to bring her claims. Additionally, Kaleikini has shown a sufficient procedural injury to establish procedural standing.

HRS § 6E–13 (b) permits individuals to bring actions for injunctive relief as follows:

*Any person* may maintain an action in the trial court having jurisdiction where the alleged violation occurred or is likely to occur for restraining orders or injunctive relief against the State, its political subdivisions, or any person *upon a showing of irreparable injury, for the protection of an historic property or a burial site and the public trust therein from unauthorized or improper demolition, alteration, or transfer of the property or burial site.*

(Emphasis added).

Although the City characterizes the "irreparable injury" requirement as a limitation on the private right of action set forth in HRS § 6E–13 (b), this requirement is more properly characterized as a limitation on standing, which is "the aspect of justiciability focusing on the party seeking a forum rather than on the issues he wants adjudicat-

ed." [21] *Citizens for Prot. of North Kohala Coastline,* 91 Hawai'i at 100, 979 P.2d at 1126; *see also Cnty. of Hawai'i v. Ala Loop Homeowners,* 123 Hawai'i 391, 406 n. 20, 235 P.3d 1103, 1118 n. 20 (2010) ("While the term 'standing' is sometimes used to describe the private right of action inquiry, nevertheless, our cases make clear that the two inquiries involve distinct policy considerations and distinct tests[.] The private right of action inquiry focuses on the question of whether *any* private party can sue to enforce a statute, while the standing inquiry focuses on whether *a particular* private party is an appropriate plaintiff.") (citations omitted) (emphasis in original).

■ In general, Hawai'i courts determine whether a plaintiff has standing by asking "(1) has the plaintiff suffered an actual or threatened injury; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury." *Id.* at 422 n. 43, 235 P.3d at 1134 n. 43 (citation and ellipsis omitted). However, HRS § 6E–13(b) qualifies the first prong of this test by requiring that the "actual or threatened injury" be an irreparable injury.

This court has further explained:

in analyzing whether a party has standing, our touchstone remains the needs of justice. . . . Thus, one whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the action that hurts his interest is illegal. Moreover, at the pleading stage, general

factual allegations of injury resulting from the defendant's conduct may suffice.

*Kaho'ohanohano v. State,* 114 Hawai'i 302, 318, 162 P.3d 696, 712 (2007) (citations, internal quotation marks, and brackets omitted).

■ Here, Kaleikini's allegations are sufficient to establish her standing. First, it is undisputed that Kaleikini has a "legitimate interest" in the iwi found in Kaka'ako, *see Kaho'ohanohano,* 114 Hawai'i at 318, 162 P.3d at 712, because she is a recognized cultural descendant of those iwi.[22] It is also undisputed that the rail project has a high likelihood of affecting iwi in Kaka'ako. Kaleikini declared that "[t]he unnecessary removal of iwi causes [her] great pain and suffering." Additionally, the record reflects the OIBC's view that "[i]ntrusions into burials" are "considered extremely offensive and disrespectful—an act of violence and degradation directed at the deceased individual, the living family members, and the larger community associated with the burial." These "general factual allegations of injury resulting from the defendant's conduct," *see Kaho'ohanohano,* 114 Hawai'i at 318, 162 P.3d at 712, are sufficient to establish that Kaleikini has suffered an actual or threatened irreparable injury.

Nevertheless, the City argues that Kaleikini has not asserted a sufficient injury because she has not "identified any specific burial that is currently threatened by the Project." However, as stated, it is undisputed that the rail project has a high likelihood of affecting iwi in Kaka'ako. Accordingly, the likelihood of uncovering burials in Kaka'ako is not speculative or conjectural, but rather is high.[23] *Cf. Mottl v. Miyahira,*

---

**21.** Although the City does not characterize its argument as a standing argument, we nonetheless must address Kaleikini's standing. *Office of Hawaiian Affairs v. Housing & Cmty. Dev. Corp. of Hawai'i,* 121 Hawai'i 324, 326–27, 219 P.3d 1111, 1113–14 (2009) (noting that this court has a "duty to consider, sua sponte, jurisdictional issues such as standing") (citation omitted).

**22.** Additionally, this court has previously recognized in a different context, in litigation concerning the availability of a contested case hearing regarding the OIBC's approval of a burial treatment plan, that Kaleikini's "cultural and religious beliefs regarding the protection of iwi" constitute a legal interest sufficient to establish

standing. *Kaleikini v. Thielen,* 124 Hawai'i 1, 26, 237 P.3d 1067, 1092 (2010) ("Throughout the instant litigation, Kaleikini has averred that her cultural and religious beliefs require her to ensure that the iwi is left undisturbed and that the OIBC's decision, allowing [General Growth Properties] to disinter the iwi, has caused her cultural and religious injury. As such, we believe Kaleikini has alleged sufficient facts upon which this court can determine she has standing.").

**23.** Moreover, the PA recognizes the potential for burials to be relocated, which presumably would be unnecessary if all of the burials could be preserved in place. Although the City acknowl-

95 Hawai'i 381, 389, 395, 23 P.3d 716, 724, 730 (2001) (noting that the plaintiff's injury must be "distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical[,]" and concluding that plaintiffs did not have standing where the allegations "amount[ed] to speculation"). Moreover, HRS § 6E–13(b), on its face, provides that an action may be maintained "where the alleged violation occurred *or is likely to occur* ... upon a showing of irreparable injury[.]" (Emphasis added). Thus, HRS § 6E–13(b) specifically acknowledges that standing may exist where an irreparable injury has not yet occurred.

In addition, the City's narrow conception of standing would frustrate enforcement of one of the central purposes of state historic preservation law, which is to require that the effects on historic properties be reviewed prior to the approval of a project. HRS § 6E–42(a); *see also* HRS § 6E–8(a). Put simply, under the City's interpretation of HRS § 6E–13 (b), private plaintiffs would not have standing to challenge the lack of an AIS until remains are uncovered during the course of construction, except in certain limited circumstances where a plaintiff happens to have prior knowledge of where burials are located. Yet that is precisely the type of situation that the historic preservation law is designed to avoid. The requirement of "irreparable injury" in HRS § 6E–13(b) must be read in light of the other provisions of chapter 6E. When it is so read, standing clearly exists in the circumstances alleged here.

The City also asserts that Kaleikini cannot show an irreparable injury to the burials because, under the PA, an AIS will be completed prior to ground-disturbing construc-

tion in each phase. Accordingly, an AIS will be performed prior to any ground disturbance in the Kaka'ako area. However, the City's point does not address Kaleikini's argument that the SHPD's approval of the entire rail project without a complete AIS forecloses the no-build option and alternative technologies or routes.[24] Thus, the approval of the rail project without an AIS may, for example, lead to the relocation of burials that otherwise would remain in place. This is sufficient to establish an irreparable injury to the iwi for purposes of HRS § 6E–13(b).

Moreover, the City's argument goes more to the merits of Kaleikini's claim than to Kaleikini's standing. *See Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Hawai'i 77, 94–95, 148 P.3d 1179, 1196–97 (2006) ("In determining whether the plaintiff has standing, we look solely to whether the plaintiff is the proper plaintiff in this case, without regard to the merits of the allegations in the complaint.") (citation and brackets omitted). In order to conclude that Kaleikini suffers no injury from the initiation of construction in Phase 1, we would first be required to accept the City's characterization of the substantive law as permitting the AIS to be completed in phases *after* the SHPD has given its concurrence to the entire project. Thus, the resolution of this question requires inquiry into the merits beyond the threshold question of Kaleikini's standing. *See id.*

■ Kaleikini also asserts that she suffered an irreparable procedural injury, because she was denied her opportunity to consult and obtain information prior to decision making on the rail project, and because

edged during oral argument that the route may need to be altered if "there is a [burial] site that prevents them from putting a column there or it's so pervasive they cannot put an alignment there," the record does not establish that the City is willing or able to reroute the project. *See infra* n. 24.

24. The parties dispute whether the City is willing or able to change the rail's route. However, the final EIS indicates that the rail is currently set to run on Halekauwila Street through Kaka'ako. There is nothing in the record, and in particular the PA, to indicate that the City intends to reroute the project if burials are encountered. Rather, the PA indicates that the City is willing to

relocate "guideway columns" "a limited distance along the guideway[,]" to use "straddle-bent supports[,]" or to "modify span length to allow for preservation-in-place[.]" Moreover, although the record reflects the Federal Transit Administration's mandate that any proposed change to the project be approved by the Federal Transit Administration in writing, the City does not identify anywhere in the record where the Federal Transit Administration has suggested it is amenable to altering the rail's route. Thus, the City's assertion that it may reroute the project so as not to affect burials in Kaka'ako is speculative and insufficient to defeat Kaleikini's standing.

"bureaucratic momentum," will lead to "after-the-fact determinations [that] may leave practitioners of customary and traditional uses unprotected from possible arbitrary and self-serving actions on [the City's] part."

In *Sierra Club v. Department of Transportation (Superferry I )*, 115 Hawai'i 299, 322, 167 P.3d 292, 315 (2007), this court recognized that a "procedural injury" may serve as a basis for standing. This court noted,

> This subset of standing doctrine—known as "procedural standing"—derives from footnote seven of the United States Supreme Court's opinion in *Lujan* [*v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ], in which the Court stated that "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal [standing] standards for redressability and immediacy.

*Id.* at 314, 167 P.3d at 321.

 In order to establish a cognizable procedural injury, "at a minimum, a plaintiff must suffer some procedural wrong *as well as* a threat to underlying concrete interests." *Id.* at 324, 167 P.3d at 317 (emphasis in original). Additionally, in order to establish that a procedural injury is sufficient to confer standing under HRS § 6E–13 (b), a plaintiff must establish that the threat to his or her concrete interests involves a threat of irreparable injury.

Here, Kaleikini "has been accorded a procedural right to protect [her] concrete interests[.]" *See id.* at 322, 167 P.3d at 315. First, as stated, Kaleikini has a concrete interest in protecting the iwi located in Kaka'ako. Additionally, although neither HRS § 6E–8 nor HRS § 6E–42 specifically requires that interested individuals such as Kaleikini be given an opportunity to participate in the historic preservation review process, HAR chapters 13–275, 13–276, and 13–

284 do so require. Specifically, HAR chapters 13–275 and 13–284 provide for a "consultation process" [25] at various points in the historic preservation review. *See, e.g.,* HAR §§ 13–275–5(e) and 13–284–5(e) (requiring, in certain circumstances, a consultation in relation to an archaeological inventory survey); HAR §§ 13–275–8(a)(3)(C) and 13–284–8(a)(3)(C) (requiring a consultation regarding mitigation commitments for historic property that has "an important value to the native Hawaiian people or to another ethnic group of the state"). Additionally, HAR chapter 13–276 (2002), which governs the scope of AISs, requires that an AIS describe the "consultation process with knowledgeable individuals." HAR § 13–276–5(a). Accordingly, the rules provide Kaleikini a procedural right to consult in the historic preservation review process. Finally, Kaleikini has sufficiently alleged that the "procedural wrong" of her being unable to consult in an AIS prior to the rail project's approval causes a threat of irreparable harm to her concrete interests in the iwi located in Kaka'ako, for the reasons stated *supra. See Superferry I*, 115 Hawai'i at 324, 167 P.3d at 317.

Based on the foregoing, Kaleikini has made a sufficient showing of irreparable injury based on both the threat of injury to the Kaka'ako burial sites and her procedural injury, and therefore has standing to pursue her claims.

**B. HAR chapters 13–275 and 13–284 required the completion of an AIS prior to the SHPD's approval of the rail project**

 Kaleikini argues that the City and State failed to comply with HRS §§ 6E–8 and 6E–42 and their implementing rules by proceeding with the rail project prior to the completion of an AIS. Specifically, Kaleikini argues that, under the relevant rules, the historic preservation review process is a sequential process that requires the completion

---

25. "Consultation process" means "notifying interested organizations and individuals that a project could affect historic properties of interest to them; seeking their views on the identification, significance evaluations, and mitigation treatment of these properties; and considering their views in a good faith and appropriate manner

during the review process." HAR § 13–275–2; *see also* HAR § 13–284–2.

"Interested persons" is defined as "those organizations and individuals that are concerned with the effect of a project on historic properties." HAR § 13–275–2.

of an AIS prior to approval of the project. Kaleikini also argues that "[t]here is only one project at issue in this case: the entire 20–mile fixed guideway rail system." Accordingly, Kaleikini argues, the City cannot phase its AIS for the rail project but must instead "study all phases" of the rail project. Kaleikini argues that delaying or phasing the AIS is inconsistent with the purposes of HRS chapter 6E and its implementing rules.

In response to Kaleikini's argument that the sequential nature of the historic preservation review process under the relevant rules requires the completion of an AIS prior to approval of the project, the City asserts that the SHPD had the opportunity to review the project and provide its approval and concurrence as required under HRS chapter 6E. The State similarly argues that the requirements of HRS chapter 6E have been met, and also argues that the applicable rules "allow SHPD to concur with commencement of projects absent full completion of the review process, where appropriate interim protection plans are in place." (Citing HAR §§ 13–275–3 and 13–284–3). The State asserts that the PA constitutes an "interim protection plan" that allows the project to proceed prior to the completion of an AIS.

With regard to phasing, both the City and State argue that phasing is not expressly prohibited by HRS chapter 6E, the SHPD has discretion to determine the scope of the "project" and to approve a phased approach, and phasing is not contrary to the policies underlying HRS chapter 6E.

As set forth below, Kaleikini is correct that the applicable rules clearly establish a sequential approach to the historic preservation review process, which requires the completion of an AIS prior to the approval of a project. This process was not followed in the instant case. Moreover, although the rules permit a project to commence where an "interim protection plan" is in place, the definition of "interim protection measures" contained in HAR chapter 13–277 indicates that the PA does not constitute an "interim protection plan." When viewed in context, it is apparent that an "interim protection plan" is a form of mitigation that, under the sequential approach of the rules, can only be developed *after* an AIS has been completed. *See* HAR §§ 13–275–8(a)(1), 13–284–8(a)(1), 13–275–9(d), and 13–284–9(d).

Additionally, as set forth below, the City and State's arguments regarding phasing are without merit. Phasing the AISs subsequent to approval of the project is impermissible because the rules require that historic properties in the "project area" be identified prior to approval. The broad definition of the term "project area" encompasses the entire rail project corridor, and the historic preservation review process was therefore required to identify significant historic properties in the entire rail project corridor prior to the SHPD giving its concurrence. Accordingly, the circuit court erred in granting summary judgment in favor of the City and State on Counts 1 through 4.

1. **The applicable rules establish a sequential approach to the historic preservation review process**

HRS § 6E–8 provides, in pertinent part:

**Review of effect of proposed state projects.** (a) *Before any agency or officer of the State or its political subdivisions commences any project* which may affect historic property, aviation artifact, or a burial site, *the agency or officer shall advise the [DLNR] and allow the [DLNR] an opportunity for review of the effect of the proposed project* on historic properties, aviation artifacts, or burial sites, consistent with section 6E–43, especially those listed on the Hawaii register of historic places. *The proposed project shall not be commenced, or in the event it has already begun, continued, until the [DLNR] shall have given its written concurrence.*

(Emphasis added).

HRS § 6E–42 provides, in pertinent part:

**Review of proposed projects.** (a) *Before any agency or officer of the State or its political subdivisions approves any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, which may affect historic property, aviation artifacts, or a burial site, the agency or office shall advise the [DLNR] and prior to any approval allow*

*the [DLNR] an opportunity for review and comment on the effect of the proposed project* on historic properties, aviation artifacts, or burial sites, consistent with section 6E–43, [26] including those listed in the Hawaii register of historic places.

(Emphasis added).

Both HRS §§ 6E–8 and 6E–42 apply in the instant case. Both statutes similarly provide for a review and comment process for projects that may affect burial sites. However, while HRS § 6E–8 applies to projects commenced by "any agency or officer of the State or its political subdivisions[,]" HRS § 6E–42 applies only to projects which require the approval of "any agency or officer of the State or its political subdivisions" for a "permit, license, certificate, land use change, subdivision, or other entitlement for use[.]" Here, the rail project is a project commenced by the City, and therefore HRS § 6E–8 applies. Additionally, the City is required to approve various permits for the rail project, including a special management area permit, and therefore HRS § 6E–42 also applies.

Both statutes require that the DLNR be given an opportunity to review and comment on the proposed project. *See* HRS §§ 6E–8 and 6E–42. Additionally, HRS § 6E–8 requires that the DLNR give its written concurrence before the project can commence, while HRS § 6E–42 does not. *Compare* HRS § 6E–8 *with* HRS § 6E–42. Here, the City and State argue that the requirements

of HRS §§ 6E–8 and 6E–42 have been met because the SHPD was given an opportunity to review and comment on the rail project, and the SHPD gave its written concurrence by way of its concurrence in the PA.

However, while HRS §§ 6E–8 and 6E–42 provide generally for a review and comment process, the details of this process are governed by HAR chapter 13–275 (for HRS § 6E–8) and HAR chapter 13–284 (for HRS § 6E–42). *See* HAR § 13–275–1(b) ("This chapter itemizes the process to obtain concurrence."); HAR § 13–284–1(b) ("This chapter itemizes the review process that the SHPD shall follow to make comments ... thereby meeting the opportunity to comment under [HRS § ] 6E–42[.]"). The administrative rules provide for a very similar review and comment process under both statutes.

The rules implementing HRS § 6E–8 note that, before an agency can begin a project, the SHPD must generally provide a determination letter, which is "the SHPD's written response which either concurs or does not concur with the agency's proposed project." [27] HAR §§ 13–275–2 and 13–275–3(a). The SHPD may issue a determination letter where "adequate information" has been received, and "[i]n cases where interim protection plans are adequately in place or data recovery fieldwork has been adequately completed[.]" HAR § 13–275–3(a).[28] "Once concurrence is received, the agency may begin with the project." HAR § 13–275–3(a). The

---

**26.** HRS § 6E–43 (2009) concerns the handling of prehistoric and historic burial sites.

**27.** A determination letter containing the SHPD's concurrence in the project is not required under HRS § 6E–42. Instead, "the agency involved ... shall consult with the SHPD and shall obtain the written comments of the SHPD at each step of the review." HAR § 13–284–3(a). Nevertheless, under the rules, the § 6E–42 process, like the § 6E–8 process, requires that the SHPD give its written acceptance or concurrence at various stages of the project. *See, e.g.,* HAR §§ 13–284–5(f), 13–284–6(e), 13–284–8(c). For purposes of the instant case, the review steps under HAR chapter 13–284 are nearly identical to those contained in chapter 13–275, and accordingly are not discussed in detail herein.

**28.** In its entirety, HAR § 13–275–3(a) provides:

For the department to provide a letter of determination, an agency proposing a project which

may have an effect upon historic properties shall notify the department of the proposed project and request a letter of determination. Upon the request of the department, the agency shall provide the department with information as to the number of historic properties within a proposed project area, their significance, the impact of the proposed project on the historic properties, and any proposed mitigation measures. *Upon receipt of adequate information the department will provide a determination letter within ninety days.* Any agency involved in the historic preservation review process shall consult and obtain the written approval of the SHPD at each step of the review. Once concurrence is received, the agency may begin the project. *In cases where interim protection plans are adequately in place or data recovery fieldwork has been adequately completed, a determination letter may be issued.* (Emphasis added).

process for obtaining a determination letter is, in brief summary, as follows.

First, an agency proposing a project "shall notify the [DLNR] of the proposed project and request a letter of determination." HAR § 13–275–3(a). The agency must then identify and inventory historic properties present in the project area. HAR §§ 13–275–3(b)(1), 13–275–5(a). In so doing, the agency "shall first consult the SHPD to determine if the area proposed for the project needs to undergo an inventory survey to determine if historic properties are present." HAR § 13–275–5(b). The SHPD may respond to the agency's request in one of three ways: (1) by determining that no historic properties are present; (2) by determining that "an adequate survey exists and that historic properties are present," which allows the agency to proceed to "the next step in the review process, [i.e.,] evaluation of the significance of the historic properties"; or (3) by concluding that an inventory survey needs to be done, which must "identify all historic properties and gather enough information to evaluate the properties' significance." [29] HAR §§ 13–275–5(b)(1)–(5).

Here, it is undisputed that the SHPD concluded an AIS needed to be done. The rules define an AIS as "the *identification and documentation* of archaeological historic properties and burial sites in a delineated area, *gathering sufficient information to evaluate significance of the historic properties and burial sites,* and compiling the information into a written report for review and acceptance by the department." HAR § 13–275–2 (emphasis added). The rules further provide that an AIS:

> may be undertaken when the SHPD concludes that archaeological properties are present or are likely to be present. Archaeological survey often involves detailed field mapping and test excavations, laboratory analyses, and interpretive studies.... Results of the survey shall be reported either through an archaeological assess-

ment, if no sites were found, or an archaeological survey report[.] HAR § 13–275–5(b)(5)(A).

Where the SHPD determines that an AIS is needed, a copy of the completed archaeological assessment or survey report "shall" be submitted to the SHPD for review. HAR § 13–275–5(e). Interested persons are given an opportunity to comment on the assessment or report. HAR § 13–275–5(e)(1). The SHPD must inform the agency within 45 days if the information contained in the report or assessment is adequate or inadequate. HAR § 13–275–5(e). If the report or assessment is inadequate, the agency is given an opportunity to correct the problems and resubmit the results. HAR § 13–275–5(e)(2). If the report or assessment is adequate, it is accepted by the SHPD. HAR § 13–275–5(e)(3). If the assessment or report is accepted and indicates no historic properties are present, "then historic preservation review ends *and the SHPD shall include in the notice of final acceptance its written concurrence to the project* [.]" HAR § 13–275–5(f) (emphasis added). In contrast, if the report is adequate and historic properties *are* present, then the review process continues and "the significance of *each property* shall be evaluated and discussed[.]" HAR § 13–275–5(g) (emphasis added).

The initial assessment of the significance of each property may be made by the agency or the SHPD. HAR § 13–275–6(a). For properties other than architectural properties, the agency must "consult with ethnic organizations or members of the ethnic group for whom some of the historic properties may have significance ... to seek their views on the significance evaluations." HAR § 13–275–6(c). The SHPD must concur in the assessments of significance before they are finalized. HAR § 13–275–6(d). "If there is an agreement that none of the historic properties are significant, then historic preservation review ends and the SHPD shall issue its written concurrence to the project[.]" HAR § 13–275–6(e). However, "[w]hen significant historic properties *are* present, then impacts of the proposed action

**29.** The rules describe three types of inventory surveys: an archaeological inventory survey, an ethnographic survey, and an architectural inventory survey. HAR §§ 13–275–5(b)(5)(A)–(C).

on these properties shall be assessed, and mitigation commitments shall be devised as needed." *Id.* (emphasis added).

The impact of the proposed action on historic properties is initially determined by the agency. HAR § 13–275–7(a). There are two possible determinations: (1) "no historic properties affected"; or (2) "[e]ffect, with proposed mitigation commitments," meaning "[t]he project will affect one or more significant historic properties, and the effects will be potentially harmful. However, the agency has proposed mitigation commitments ... to reasonably and acceptably mitigate the harmful effects." HAR §§ 13–275–7(a)(1)–(2). The agency's determination must be submitted to the SHPD for review and approval, and must include "a map showing the location of the project and a general discussion of the project's scope of work, so the nature of possible effects can be understood." HAR § 13–275–7(c). If the SHPD "agrees that the action will not affect any significant historic properties, this is the SHPD's written concurrence and historic preservation review ends." HAR § 13–275–7(e). However, if the project *"will have* an 'effect, with proposed mitigation commitments', then mitigation commitments and *detailed mitigation plans* shall be developed by the agency and approved by SHPD[.]" *Id.* (emphasis added).

Finally, where a project will have an effect on significant historic properties, "then a mitigation commitment proposing *the form of mitigation to be undertaken for each significant historic property* shall be submitted by the agency to the SHPD for review and approval." HAR § 13–275–8(a) (emphasis added). In certain circumstances, the agency must also consult with "ethnic organizations or members of the ethnic group for whom the historic properties have significance ... to seek their views on the proposed forms of mitigation." HAR § 13–275–8(a)(2). The mitigation commitment must contain, inter alia, "[a] table of the significant historic properties, indicating which form or forms of mitigation is proposed for each property[.]" HAR § 13–275–8(a)(3)(A). "If the commitments are acceptable, the SHPD shall send a determination letter concurring with the proposed project[.]" HAR § 13–

275–8(c). Additionally, however, "[i]f identified unmarked burial sites are present, the relevant island burial council of the [DLNR] must approve the proposed mitigation commitments for native Hawaiian burials, following [HRS § ] 6E–43, ... and [HAR § ] 13–300–33." HAR § 13–275–8(d).

Again, "[o]nce concurrence is received, the agency may begin with the project." HAR § 13–275–3(a). However, the agency must still provide the SHPD with "detailed plans for the mitigation work for SHPD review and approval." HAR § 13–275–8(h). Additionally, once the detailed mitigation plans are carried out, the agency must document its completion of the plan, and must request verification from the SHPD that the mitigation work has been completed. HAR § 13–275–9(a). If the SHPD concludes that the mitigation work has been successfully concluded, "the historic preservation process is concluded." HAR § 13–275–9(a), (c).

In sum, the rules clearly set out a sequential process for obtaining the SHPD's concurrence to a project. Where an AIS is required, it forms part of the first step in this process, i.e., identification and inventory of historic properties in the project area. HAR § 13–275–5. Once an adequate AIS has been submitted, the significance of "each property" is evaluated. HAR § 13–275–5(g); *see also* HAR § 13–275–6. If significant historic properties are present, the impact of the proposed project on the properties must be assessed. HAR § 13–275–7. If the project will affect significant historic properties, the agency must submit mitigation commitments, "proposing the form of mitigation to be undertaken for *each significant historic property* [.]" HAR § 13–275–8(a) (emphasis added). The rules do not authorize the issuance of a determination letter until these mitigation commitments have been accepted by the SHPD. HAR § 13–275–8(c).

It is undisputed that these steps were not followed prior to the SHPD's concurrence in the rail project. Here, the SHPD concluded that an AIS needed to be completed for all four phases of the rail project. However, only the AIS for Phase 1 was completed prior to the SHPD's concurrence in the project.

Additionally, the PA does not fulfill the same functions as the historic preservation review process. While the rules utilize an AIS to identify and evaluate *specific* historic properties and to develop *specific* forms of mitigation for those properties, the PA provides generally that historic properties are present in the project area, that OIBC will be consulted with regard to burials, and that the as-yet-unidentified burials identified during the AIS process will either be preserved in place or relocated.

In short, the PA commits to undergoing the historic preservation review process at a later time. The City appears to acknowledge this in its opening brief, where the City states that, "[i]n accordance with the terms of the PA and [c]hapter 6E, SHPD will continue to be consulted, have the opportunity to comment, and retain the right and authority to approve the remaining Phases." However, the City does not address the rules, which require that these steps be taken *before* the SHPD gives its concurrence in the project.

Nevertheless, the State argues that "[a]pplicable rules recognize SHPD's discretion over decisions regarding the appropriate scope and approach of the historic preservation review process for a given project." (Citing, inter alia, HAR §§ 13–275–5 and 13–284–5 [30]). However, the provisions cited by the State do not support the State's apparent assertion that the SHPD has the discretion to opt-out of the sequential process outlined in the rules. HAR §§ 13–275–5 and 13–284–5 provide the SHPD with the discretion to determine whether an AIS is necessary. HAR §§ 13–275–5(b) and 13–284–5(b). The State does not point to any subsection of HAR §§ 13–275–5 or 13–284–5 that affords the SHPD discretion to forego or delay an AIS where one is required.

Accordingly, the applicable rules establish a sequential approach to the historic preservation review process, under which an AIS

will be completed prior to the SHPD giving its concurrence in a project. These steps were not followed in the instant case. Accordingly, the SHPD improperly concurred in the rail project.

### 2. The PA does not constitute an interim protection plan

■ In the circuit court, the City argued that the PA constituted an "interim protection plan" that allowed the SHPD to give its concurrence in the rail project. Although the City does not press this argument on appeal, the State argues that "[t]he rules expressly allow SHPD to concur with commencement of projects absent full completion of the review process, *where appropriate interim protection plans are in place.*" (Emphasis added).

HAR § 13–275–3(a) provides, in pertinent part: "In cases where interim protection plans are adequately in place *or* data recovery fieldwork has been adequately completed, a determination letter may be issued." (Emphasis added). HAR § 13–284–3(a) similarly provides, in pertinent part: "In cases where *any* interim protection plans are adequately in place *and any* data recovery fieldwork has been adequately completed, the project may commence from a historic preservation perspective." (Emphasis added). The differences in these two provisions do not appear to be material,[31] and accordingly, we focus on HAR chapter 13–275 for ease of reference.

The State's argument fails because the PA does not constitute an interim protection plan. The State asserts that the PA constitutes an interim protection plan because:

the PA requires completion of AISs for each construction phase of the Project and mandates consultation with OIBC regarding the disposition of any burials discovered through that process prior to final de-

---

**30.** The State also cites to HAR §§ 13–275–3 and 13–284–3, which are discussed *infra.*

**31.** Although HAR § 13–284–3(a) is worded in the conjunctive, the additional insertion of the word "any" appears to suggest that the intent was not to require both an interim protection plan and data recovery fieldwork. This makes sense since there could be projects where, for example, an

interim protection plan would be adequate to protect existing burials from damage during construction and, therefore, there would be no need to recover data from those burial sites since they would presumably remain intact. *See* discussion *infra* describing "interim protection measures" and "archaeological data recovery."

sign and commencement of any ground-disturbing activities in each phase. The PA expressly preserves all protections afforded historic properties, and burials in particular, under [c]hapter 6E and ensures that the full review process is complete for each phase before ground-disturbing work commences in each phase.

Put another way, the State appears to assert that the PA constitutes an interim protection plan because it requires that the historic preservation review process, and the protections it affords, be complied with at a later date. In general, an agency's interpretation of its own rules is entitled to deference. *Gillan*, 119 Hawai'i at 125, 194 P.3d at 1087 (citation omitted). However, we do not defer to agency interpretations that are "plainly erroneous or inconsistent with the underlying legislative purpose." *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i at 425, 83 P.3d at 688; *see In re Water Use Permit Applications*, 94 Hawai'i 97, 145, 9 P.3d 409, 457 (2000) ("[W]e have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation."). In the instant case, the State's interpretation of the phrase "interim protection plan" is not supported by the rules, and is therefore plainly erroneous.

"Interim protection plan" is not defined in either HAR chapter 13–275 or 13–284. However, HAR chapter 13–277, which contains the SHPD's requirements for archaeological site preservation and development, addresses "interim protection measures." HAR § 13–277–5 (2002). These measures include:

(1) Flagging the perimeter of the buffer zone;

(2) Erecting barriers (such as plastic fencing) along the buffer zone;

(3) Placing avoidance instructions on construction plans and specifications;

(4) On-site, pre-construction briefing of the hired construction firm; and

(5) Having an archaeological monitor on-site during ground alteration activities.

HAR § 13–277–5.

Presumably, then, an interim protection plan is a plan to institute these or similar types of interim protection measures. Notably, these measures appear designed to protect specific, identified archaeological resources during the construction phase of the project and do not involve, as the State asserts, a plan to comply with the historic preservation review process at a later date.

This interpretation is confirmed when the reference to "interim protection plan" in HAR § 13–275–3(a) is viewed in the larger context of chapter 13–275. Specifically, the section of chapter 13–275 addressing mitigation contains references to both "protection" and "data recovery."[32] HAR § 13–275–8(a)(1)(A) ("Preservation [ ] may include *avoidance and protection (conservation)*, stabilization, rehabilitation, restoration, reconstruction, interpretation, or appropriate cultural use.") (emphasis added); 13–275–8(a)(1)(C) (noting that archaeological data recovery "enables the recovery of an adequate and reasonable amount of the significant information from a significant historic property prior to its alteration or destruction").

Under the sequential process described *supra*, mitigation plans can only be developed after significant historic property has been identified through an AIS or similar study. This is because "[t]he review process is designed to identify significant historic properties in project areas *and then* to develop and execute plans to handle impacts to the significant properties in the public interest." HAR § 13–275–1(a) (emphasis added). As Kaleikini states, it would "turn[ ] the process upside down" to permit mitigation commit-

---

**32.** Additionally, data recovery appears to refer to the specific treatment of an identified significant historic property. Because either an "interim protection plan" or "data recovery" is sufficient to allow a project to proceed under HAR § 13–275–3(a), the meaning of "interim protection plan" should be interpreted in light of the definition of "data recovery." *State v. Matavale*, 115 Hawai'i 149, 160, 166 P.3d 322, 333 (2007)

("[T]he meaning of words or phrases in a statute may be determined by reference to the meaning of words or phrases associated with it[.]") (citation omitted). Because the definition of "data recovery" involves the treatment of specific historic properties, it would be inconsistent to interpret "interim protection plan" to refer to a general plan for the treatment of as-yet-unidentified historic properties.

ments to be made prior to the properties at issue being identified.

Based on the foregoing, the State is incorrect in its assertion that the PA constitutes an interim protection plan.

### 3. The City's and State's arguments regarding phasing are without merit

 The City and State argue that phasing of the historic preservation review process is permissible because (1) phasing is not expressly prohibited by HRS chapter 6E; (2) phasing of the historic preservation review process is distinct from the concept of segmentation that is prohibited in the preparation of an EIS; (3) the SHPD has discretion to determine the scope of the "project" and to approve a phased approach; and (4) HRS chapter 6E is silent on phasing, and this court should therefore look to federal law, which expressly permits phasing, for guidance.

The City's and State's arguments are without merit. Neither HRS § 6E–8 nor § 6E–42 explicitly addresses whether the historic preservation review process may be undertaken in phases. However, the implementing rules for HRS §§ 6E–8 and 6E–42 require identification of significant historic properties in the "project area," as well as specific plans to address any impacts on those properties. *See, e.g.,* HAR §§ 13–275–1(a), 13–284–1(a). This process must be completed before the SHPD gives its concurrence, and before the agency may begin with the project. HAR §§ 13–275–3(a), 13–284–3(a). The definition of "project area" is quite broad, and provides:

> "Project area" means *the area the proposed project may potentially affect, either directly or indirectly.* It includes not only the area where the proposed project will take place, but also the proposed project's area of potential effect.

HAR §§ 13–275–2 and 13–284–2 (emphasis added).

This definition of "project area" encompasses all four phases of the rail project. Specific to the issue presented here, the rail corridor through Kaka'ako is one of the areas in which the rail project "will take place,"

and is thus one of the areas "the proposed project may potentially affect[.]" *See id.* Kaka'ako is therefore within the "project area," and the historic preservation review process was required to identify significant historic properties in this area, and to address any impacts on those properties, prior to the SHPD giving its concurrence. *See, e.g.,* HAR §§ 13–275–1(a) and 13–284–1(a).

The City and State point out that phasing is explicitly prohibited in the environmental review process (and specifically the Hawai'i Environmental Policy Act (HEPA)), but not in the historic preservation review process. HEPA governs environmental assessments and EISs for certain types of "actions." *See* HRS chapter 343–2. An "action" is defined as "any program or project to be initiated by any agency or applicant." HRS § 343–2. Under the HEPA's implementing rules, multiple or phased "actions" are considered a "single action" in certain specified circumstances:

> Multiple or Phased Applicant or Agency Actions. A group of actions proposed by an agency or an applicant shall be treated as a single action when:
>
> A. The component actions are phases or increments of a larger total undertaking;
>
> B. An individual project is a necessary precedent for a larger project;
>
> C. An individual project represents a commitment to a larger project; or
>
> D. The actions in question are essentially identical and a single statement will adequately address the impacts of each individual action and those of the group of actions as a whole.

HAR § 11–200–7.

The City and State argue that, because the historic preservation law does not contain a provision similar to HAR § 11–200–7, phasing is permissible. We recognize that there is no similar provision in HRS chapter 6E or its implementing rules that specifically addresses whether and when multiple phases of a project must be considered to be a single project. However, the broad definition of "project area" is, in itself, inconsistent with phasing. Thus, while we agree with the City

and State that the historic preservation laws and the environmental protection laws involve differing goals, policy considerations, and protections, we do not find these distinctions to be dispositive. Rather, our analysis is based on the plain language of the respective rules and, specifically, the definition of "project area."

 The City and State also assert that the SHPD has discretion to determine what comprises a "project" under HRS chapter 6E, and that its determination that a project can be phased is entitled to deference. We note initially that the question of "whether or not an agency has followed proper procedures . . . in making its determination is a question of law, and will be reviewed *de novo*." *Superferry I*, 115 Hawai'i at 315, 167 P.3d at 308. In the instant case, we are asked to determine whether the SHPD followed proper procedures in concurring in the rail project. Under *Superferry I*, this is a question of law, for which the agency is not entitled to deference. Moreover, where a rule is unambiguous and consistent with the policies of the statute, and its application will not produce an absurd or unjust result, we enforce the rule's plain meaning. *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i at 425, 83 P.3d at 688. Here, no ambiguity is created by the absence of an express phasing provision from HAR chapters 13–275 and 13–278. Under the plain meaning of the rules, the review process for the entire project area must be completed prior to the SHPD giving its concurrence in a project.

Moreover, even assuming arguendo that our review of this issue is deferential to the agency, we note that we are not being asked to defer to any express conclusion of the SHPD. Although Aiu suggested in her declaration that the SHPD views the PA as satisfying the requirements of HRS chapter 6E, the PA itself does not reflect any express consideration of whether phasing is permissible under state law. To the contrary, the provisions of the PA, and the phased process it sets forth, focus on compliance with federal law. The PA begins by noting that the rail project is a federal undertaking subject to section 106 and its implementing regulations, and the EIS refers to the PA as a "Section

106 of the National Historic Preservation Act Draft Programmatic Agreement." The PA also notes that the Federal Transit Administration consulted with the SHPD as a requirement under the federal regulations. *See* 36 C.F.R. § 800.2(c)(1). It states that the Federal Transit Administration and the SHPD "have agreed that a phased approach to identification and evaluation of archaeological sites is appropriate, *pursuant to 36 C.F.R. § 800.4(b)(2)* [.]" (Emphasis added). Notably absent is any reference to the phased approach fulfilling the requirements of HRS chapter 6E. Although the SHPD ultimately agreed to the phased approach, we are unconvinced that the SHPD's concurrence in the PA constitutes a discretionary decision as to the requirements of HRS chapter 6E, to which we might otherwise give deference.

In addition, the SHPD concurred in the *entire* rail project by executing the PA. Indeed, the final EIS acknowledges that "[t]he project is not a series of projects, but a *single project that consists of a series of construction phases* [.]" (Emphasis added). And, the City admitted, in its responses to Kaleikini's requests for admission, which were submitted with Kaleikini's motion for reconsideration, that "[a]ll four phases of the [rail project] are connected *and part of a single project.*" (Emphasis added). Again, the rules do not afford the SHPD discretion to opt-out of the sequential review process outlined in the rules. *See* HAR §§ 13–275–3(a), 13–284–3(a). The rules require the SHPD to complete the entire historic preservation review process prior to giving its concurrence in *a project*, in this case, the entire rail project.

The City and State also argue that this court should conclude that it is permissible to conduct the historic preservation review process in phases, because federal law expressly permits a phased approach, and no express prohibition against phasing is contained in Hawai'i law. The regulations implementing the National Historic Preservation Act of 1966 (NHPA) explicitly permit the phased identification and evaluation of historic properties as follows:

Phased identification and evaluation. Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts. *The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, a programmatic agreement executed pursuant to § 800.14(b), or the documents used by an agency official to comply with the National Environmental Policy Act pursuant to § 800.8.* The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of the [State Historic Preservation Officer/Tribal Historic Preservation Officer] and any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.

36 C.F.R. § 800.4(b)(2) (emphasis added).

The Hawai'i rules contain no such provision, and we find the City's and State's reliance on federal law unpersuasive in this context. An examination of the federal regulations reveals that phasing is central to the federal historic preservation review process. The federal regulations contain separate provisions regarding phasing for the identification and evaluation stage, the assessment stage, and the mitigation stage. 36 C.F.R. §§ 800.4(b)(2), 800.5(a)(3), 800.6(a)(1)(i)(C). The regulations also contain detailed provisions regarding the use and development of programmatic agreements, and allow the Advisory Council on Historic Preservation to provide a prototype programmatic agreement that may be used for other federal projects. 36 C.F.R. § 800.14(b). A body of federal caselaw has

developed regarding the propriety of phasing projects. *E.g., Wilderness Soc'y v. U.S. Bureau of Land Mgmt.,* 822 F.Supp.2d 933, 949–51 (D.Ariz.2011). Furthermore, federal courts have declined to import the phasing concept into other aspects of federal law. *E.g., N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.,* 545 F.3d 1147, 1158–59 (9th Cir.2008) (noting that phasing is permitted under the NHPA, but concluding that it is not permitted under § 4(f) of the Department of Transportation Act, which requires that an evaluation be completed prior to an agency issuing a record of decision).

■ None of the detailed provisions, limitations, or safeguards defining the federal law on phasing are contained in state law. While federal law is a useful tool for interpreting state law where federal and state provisions are analogous, *see State v. Ontai,* 84 Hawai'i 56, 61, 929 P.2d 69, 74 (1996) ("[F]ederal law is an important aid to construction because HRS § 842–2 was derived from the federal ... statute."); *see also Cvitanovich–Dubie v. Dubie,* 125 Hawai'i 128, 142 n. 15, 254 P.3d 439, 453 (2011) (noting that interpretations of federal rules "provide persuasive reasoning for the interpretation of" similar state rules), it does not provide a means of importing absent provisions into Hawai'i law. In the circumstances here, reliance on federal law would involve more than simply providing context or content for an existing state statute or regulation. It would require us to import a complex and detailed federal regulatory scheme that has no analog in state law.

Moreover, a review of HAR chapters 13–275 and 13–284 indicates that the drafters of the rules were aware of the federal regulations. Some of the Hawai'i rules refer directly to federal standards. *See* HAR §§ 13–275–8(h)(5) and 13–284–8(e)(5) (referring to the Secretary of the Interior's standards for historic preservation). Additionally, some of the provisions of the Hawai'i rules appear to be loosely patterned after the federal regulations. *Compare* HAR chapters 13–275 and 13–284 *with* 36 C.F.R. §§ 800.3 through 800.16. For example, the federal regula-

tions, like the Hawaiʻi rules, set forth a general process for identification, assessment, and mitigation of effects on historic properties. 36 C.F.R. §§ 800.4 through 800.6; *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 553 (8th Cir.2003) (noting that "an NHPA analysis involves a three-step process of identification, assessment, and mitigation."). However, despite their apparent familiarity with the federal regulations, the drafters of the Hawaiʻi rules did *not* include a provision similar to 36 C.F.R. § 800.4(b)(2) that would expressly permit phasing. The silence of the Hawaiʻi rules with regard to phasing suggests an intent to preclude the phasing of projects, rather than an intent to leave that issue open.

Accordingly, the City's and State's argument that phasing of the historic preservation review process is permissible is without merit, since the rules adopted under HRS chapter 6E do not permit it.[33] Based on the foregoing analysis, the circuit court erred in granting summary judgment in favor of the City and the State on Counts 1 through 4.[34] We therefore vacate the circuit court's judgment in favor of the City and State on these counts. Although Kaleikini requests that we enter summary judgment in her favor, we note that Kaleikini sought a wide range of relief in the circuit court, and the rationale for granting or denying that relief has not been fully developed. Moreover, additional information may have become available since the City's motion was decided, and it is not clear what impact these additional facts may have on the relief Kaleikini seeks. Accordingly, we decline Kaleikini's invitation to enter judgment in her favor, and instead remand to the circuit court for further proceedings.

**C. The final EIS was not required to contain an AIS**

 Kaleikini argues that the final EIS was inadequate under HRS chapter 343 be-cause it did not contain a completed AIS. The City argues that there is no requirement in HRS chapter 343 that an EIS contain an AIS. The State does not address Kaleikini's argument.

An EIS is:

an informational document prepared in compliance with the rules adopted under [HRS] section 343-6 and which discloses the *environmental effects* of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

HRS § 343-2 (2010) (emphasis added).

The definition of "environment" contained in the administrative rules implementing HRS chapter 343 includes objects of historical significance. HAR § 11-200-2.

The rules provide a process for the preparation of draft and final EISs. HAR §§ 11-200-14 through 11-200-23. For example, the rules explain:

Chapter 343, HRS, directs that in both agency and applicant actions where statements are required, the preparing party shall prepare the EIS, submit it for review and comments, and revise it, taking into account all critiques and responses. Consequently, the EIS process involves more than the preparation of a document; *it involves the entire process of research,* discussion, preparation of a statement, and review. The EIS process shall involve at a minimum: identifying environmental concerns, obtaining various relevant data, *conducting necessary studies,* receiving public and agency input, evaluating alternatives, and proposing measures for avoiding, minimizing, rectifying or reducing adverse impacts. An EIS is meaningless without the conscientious application of the EIS pro-

---

**33.** We do not address whether the SHPD may amend the rules to allow for the phased identification and evaluation of historic properties, such as that permitted by 36 C.F.R. § 800.4(b)(2).

**34.** Aside from her arguments on the merits, Kaleikini does not provide further argument as to how the circuit court abused its discretion in denying her motion for reconsideration. Accordingly, we do not separately address this point of error.

cess as a whole, and shall not be merely a self-serving recitation of benefits and a rationalization of the proposed action. Agencies shall ensure that statements are prepared at the earliest opportunity in the planning and decision-making process. This shall assure an early open forum for discussion of adverse effects and available alternatives, and that the decision-makers will be enlightened to any environmental consequences of the proposed action.

HAR § 11–200–14 (1996) (emphasis added).

Although an EIS is not specifically required to contain an AIS, the draft EIS must contain, inter alia,

a description of the environment in the vicinity of the action, as it exists before commencement of the action, from both a local and regional perspective. Special emphasis shall be placed on environmental resources that are rare or unique to the region and the project site (*including natural or human-made resources of historic, archaeological, or aesthetic significance*) [.]

HAR § 11–200–17(G) (1996) (emphasis added).

The final EIS consists of, inter alia, "[t]he draft EIS revised to incorporate substantive comments received during the consultation and review processes[.]" HAR § 11–200–18 (1996). "The final EIS is [ ] required to be 'accepted' by the accepting authority ... before the proposed action or project can proceed to the permitting stage." *Price,* 81 Hawai'i at 180–81, 914 P.2d at 1373–74; HAR §§ 11–200–4 (1996) and 11–200–23 (1996). The acceptability of an EIS is evaluated by the decision maker "on the basis of whether the statement, in its completed form, represents an informational instrument which fulfills the definition of an EIS and adequately discloses and describes all identifiable environmental impacts and satisfactorily responds to review comments." HAR § 11–200–23.

In reviewing a challenge to an accepted EIS, this court "uses the 'rule of reason' to determine whether an EIS is legally sufficient in adequately disclosing facts to enable a decision-making body to render an informed decision." *Citizens for Prot. of*

*North Kohala Coastline,* 91 Hawai'i at 107, 979 P.2d at 1133 (brackets and citation omitted). This court has further explained that:

neither HRS [c]hapter 343 nor the administrative rules of Chapter 200 indicate the level of detail or specificity that should be included on any given subject. The statute and rules were designed to give latitude to the accepting agency as to the content of each EIS. Thus, what is required in one EIS may not be required in another, based upon the circumstances presented by the particular project. Accordingly, *the standard to consider the sufficiency of an EIS under the "rule of reason" is that an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information* to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*Price,* 81 Hawai'i at 183, 914 P.2d at 1376 (citation omitted) (emphasis added).

Additionally, "courts are reluctant to 'second guess' the decision-making body regarding the sufficiency of an EIS." *Id.* at 183 n. 12, 914 P.2d at 1375 n. 12.

In *Price,* this court considered whether an EIS was insufficient on several grounds. *Id.* at 184, 914 P.2d at 1377. First, the plaintiff argued that the EIS "provide[d] an inadequate discussion of the infrastructure in the neighborhood, specifically, a lack of discussion on the fresh water supply, waste water treatment facilities, and transportation facilities." *Id.* However, this court noted that the EIS contained "an entire section devoted to each of these topics" with a discussion of "existing conditions, anticipated impacts, and mitigating measures." *Id.* Accordingly, this court determined that "the EIS's discussion concerning infrastructure was compiled in good faith and sets forth sufficient information to enable the decision-maker to consider

fully the environmental factors involved." *Id.*

This court also held that the EIS was sufficient with regard to its discussion of pesticides and herbicides, where the EIS's "discussion of pesticides and herbicides contains at least three studies prepared by experts that detail the impact, effect, and mitigation of pesticide and herbicide usage on the Lihi Lani project." *Id.* This court similarly held that the EIS was sufficient with regard to erosion and possible flooding during construction of the project, where the EIS contained an "erosion control plan [that] would comply with relevant local and state ordinances and guidelines" and "a report prepared by Dr. Gordon Dugon on run-off and the impact to surrounding areas." *Id.* at 185, 914 P.2d at 1378. Finally, this court concluded that the EIS was sufficient with regard to native Hawaiian archaeological sites in the proposed project area. *Id.* This court noted:

> [The defendant] retained the services of Dr. Paul H. Rosendahl, a noted archaeologist, to conduct a field reconnaissance and provide a report and recommendations concerning any archeological finds that would be affected by the proposed project. There is a lengthy discussion on archeology within the EIS and Dr. Rosendahl's report. Dr. Rosendahl explains each and every finding, its location and value, and his recommendations for preservation of historic information. The study was comprehensive and more than adequate to inform the Department of General Planning of the archeological impacts of the project.

*Id.*

In sum, this court stated,

> [The defendant] has presented an EIS that consists of two volumes of material, over 400 pages. Included within the EIS are twenty-four technical reports supporting the recommendations and findings presented. The EIS addresses all of the statutory requirements of HRS chapter 343, and chapter 200, Title 11 of the Administrative Rules. Upon review of the EIS in question, we hold that it is in compliance with the mandates of HRS chapter 343, as well

as the applicable administrative rules of chapter 200.

*Id.*

Here, chapter 4.16 of the final EIS concerns archaeological, cultural, and historic resources. The EIS divided the rail corridor into ten different sub-areas to "evaluate below-ground effects on archaeological resources within the study corridor," and developed a qualitative rating system to describe potential archaeological impacts in each sub-area. "This rating system considered existing archaeological documentation, geological and depositional characteristics, and some field inspection within the study corridor." The EIS noted that the "[a]rchaeological resources already documented within the [area of potential effects] include . . . subsurface cultural layers related to Native Hawaiians that may include religious or cultural artifacts and resources, including iwi kupuna or Hawaiian burials." The EIS concluded that the potential for encountering burials in the Dillingham, Downtown, and Kaka'ako areas was high.

With regard to mitigation, the EIS noted that "[t]he Project will have an 'effect, with proposed mitigation commitments' under State law[.]" Additionally, the draft PA, which was appended to the final EIS, "describe[d] the archaeological and historic property and resource identification and evaluation effort, as well as the mitigation procedures for identified archaeological resources." The EIS noted that the draft PA "describe[d] how post-review discoveries will be handled and commits to providing public information throughout the term of the draft PA."

Based on the foregoing, "the EIS discussion concerning [archaeological resources] was compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved." *See Price*, 81 Hawai'i at 184, 914 P.2d at 1377.

Nevertheless, Kaleikini argues that the "rule of reason" requires that the EIS for the rail project include an AIS for the following nine reasons: (1) EISs often include AISs; (2) the City has included AISs in EISs it has prepared for other projects; (3) the EIS

process requires "conducting necessary studies"; (4) the City and State "admit that an AIS is a necessary study"; (5) hundreds of other burials have been found in the areas of Downtown and Kaka'ako that the rail will cross; (6) the likelihood of encountering burials is high; (7) the legislature found that native Hawaiian burials have not been afforded sufficient legal protections; (8) an AIS determines if archaeological sites are present, identifies them, gathers information regarding their significance, and provides information to decision makers to enable them to preserve historic properties; and (9) "significant negative consequences result when an AIS is not completed before construction commences[.]"

With regard to Kaleikini's first and second points, this court has previously noted that "what is required in one EIS may not be required in another, based upon the circumstances presented by the particular project." *Price,* 81 Hawai'i at 183, 914 P.2d at 1376. Accordingly, the fact that other EISs have included an AIS is not sufficient to show that an AIS was required in the instant case.

With regard to Kaleikini's third and fourth points, there is nothing in HRS chapter 343 to indicate that an AIS is a "necessary study" for the completion of an EIS. Although the City and State may, as Kaleikini asserts, "admit that an AIS is a necessary study" in the context of HRS chapter 6E, there is nothing in the record to indicate that they viewed an AIS as a "necessary study" for the completion of an EIS.

Kaleikini's remaining points address the need for an AIS to adequately identify and protect specific native Hawaiian burials. However, these concerns are addressed under HRS chapter 6E, rather than HRS chapter 343. Accordingly, proposals for the preservation of specific historic property, including burials, are not a per se requirement in an EIS.

**35.** Kaleikini also argues that *Price* is distinguishable because Kaleikini "does not seek to contradict a conclusion in the final EIS" but rather "seeks to ensure that the final EIS discloses information now rather than after decisionsmaking." (Emphasis omitted). However, it is not

Finally, Kaleikini argues that *Price* is distinguishable because the developer in that case prepared an archaeological field reconnaissance report.[35] Again, however, "what is required in one EIS may not be required in another, based upon the circumstances presented by the particular project." *Price,* 81 Hawai'i at 183, 914 P.2d at 1376. Accordingly, while a field reconnaissance report was significant to this court's analysis in *Price,* it is not required in the instant case. Additionally, the EIS in the instant case "considered existing archaeological documentation, geological and depositional characteristics, and some field inspection within the study corridor," as well as various technical reports, including the August 15, 2008 Archaeological Resources Technical Report.

Accordingly, although the final EIS did not include an AIS, it was nonetheless sufficient "to enable the decision-maker to consider fully the environmental factors involved." *See Price,* 81 Hawai'i at 184, 914 P.2d at 1377.

**D. The City and State gave full consideration to cultural and historic values as required under HRS chapter 205A**

 Kaleikini argues that, in declining to conduct an AIS prior to approval and commencement of the rail project, the City and State failed to give full consideration to cultural and historic values, as required under HRS chapter 205A. The City argues that it has "clearly considered and taken appropriate steps to handle the possible impacts on burials." Kaleikini's argument is without merit.

HRS chapter 205A is Hawaii's Coastal Zone Management Act (CZMA). Under HRS chapter 205A, a permit is required for development in any special management area. HRS § 205A–28 (2001). It is undisputed that a special management area permit was required, and obtained, in the instant case.

clear what aspect of the *Price* decision Kaleikini refers to. In any event, the plaintiff in *Price* challenged the sufficiency of the EIS, rather than solely "a conclusion in the final EIS." *Price,* 81 Hawai'i at 183–84, 914 P.2d at 1376–77.

The coastal zone management program has several objectives.[36] HRS § 205A-2. With regard to historic resources, the objectives of the coastal zone management program are to "[p]rotect, preserve, and, where desirable, restore those natural and manmade historic and prehistoric resources in the coastal zone management area that are significant in Hawaiian and American history and culture." HRS § 205A-2(b)(2)(A) (2001). "In implementing the objectives of the coastal zone management program, the agencies shall give full consideration to ecological, cultural, historic, esthetic, recreational, scenic, and open space values, and coastal hazards, as well as to needs for economic development." HRS § 205A-4(a) (2001). Additionally, these objectives are "binding upon actions within the coastal zone management area by all agencies, within the scope of their authority." HRS § 205A-4(b) (2001). This court has recognized that a special management area permit may only be granted where the proposed development is "consistent with [CZMA] objectives and policies[.]" *PASH*, 79 Hawai'i at 435, 903 P.2d at 1256. Accordingly, in granting a special management area permit for the rail project, the City was required to give "full consideration to ... cultural [and] historic ... values." HRS § 205A-4(a).

Kaleikini cites two cases for the proposition that the City has failed to fully consider cultural and historic values: *Hui Alaloa v. Planning Commission of the County of Maui*, 68 Haw. 135, 705 P.2d 1042 (1985), and *Ka Pa'akai O Ka 'Aina v. Land Use Commission*, 94 Hawai'i 31, 7 P.3d 1068 (2000). In *Hui Alaloa*, this court considered whether the planning commission properly granted two special management area permits. 68 Haw. at 135-36, 705 P.2d at 1043. This court noted that:

Surface archaeological surveys prepared for [the developers] were presented to the planning commission. Additionally, testimony was given on behalf of all the parties. The planning commission granted permits to [the developers] conditioned upon retention of a qualified archaeologist to conduct a further survey and excavation of the area, and to "prepare a written report to maximize information retention through preservation or salvage of significant archaeological sites and to provide a plan for protecting, restoring, interpreting, and displaying historical resources either preserved on or salvaged from the subject areas."

*Id.* at 136-37, 705 P.2d at 1044 (record citations omitted).

Additionally, this court noted that, under the planning commission's decision and order, "[the developer's] archaeologist is to determine the significance of various archaeological sites" and the developers were required to "eliminate all grading or construction impact on any significant archaeological sites prior to salvage and preservation." *Id.* at 137, 705 P.2d at 1044 (record citations omitted).

This court held that:

imposing these self-serving conditions without requiring a hearing to review the additional study and survey by the commission [was] in error. The determination whether the development complies with the policies and objectives of the CZMA regarding historical and archaeological significance was, in essence, left to the [developers] contrary to the statutory command governing the issuance of SMA permits. The statute clearly mandates the planning commission to make such determinations prior to the issuance of a SMA permit.

*Id.*

Accordingly, this court's resolution of the case turned on the "unlawful delegation of duty" to the developers. *Id.* Moreover, this

---

36. "Coastal zone management program" is defined as

the comprehensive statement in words, maps, or other permanent media of communication, prepared, approved for submission, and amended by the State and approved by the United States government pursuant to Public Law No. 92-583, as amended, and the federal

regulations adopted pursuant thereto, *which describes objectives, policies, laws, standards, and procedures to guide and regulate public and private uses in the coastal zone management area*, provided however the "coastal zone management program" is consistent with the intent, purpose, and provisions of this chapter[.]

HRS § 205A-1 (2001) (emphasis added).

court expressly noted that the delegation in *Hui Alaloa* differed from "conditions requiring the applicants to obtain approval from other government agencies such as the state department of health and county department of public works" because "[t]hose agencies are not interested parties to the permit application" and are "required to help enforce and implement CZMA by assuring that proposed development projects requiring permits or approvals are consistent with the objectives and policies of CZMA." *Id.* The instant case is distinguishable from *Hui Alaloa*, in that the signatories to the PA, specifically the BLNR and the Department of Transportation Services, have a continuing role in the enforcement of the PA, and "are required to help enforce and implement CZMA by assuring that proposed development projects requiring permits or approvals are consistent with the objectives and policies of CZMA." *See id.* Accordingly, Kaleikini's reliance on *Hui Alaloa* is misplaced.

*Ka Pa'akai O Ka 'Aina* concerned the Land Use Commission's (LUC) grant of a petition to reclassify land from "Conservation District" to "Urban District." 94 Hawai'i at 34, 7 P.3d at 1071. The LUC's approval of the petition provided that the developer

> *will develop* and implement a Resource Management Plan ("RMP") which *would coordinate* development with native Hawaiian rights to coastal access for the purpose of traditional cultural practice.... Under [the developer's] *concept of the RMP,* the goals of the RMP are to provide for resource management and ensure public access to the coastal area which balances [the developer's] needs with the traditional needs of native Hawaiians and the recreational needs of the public.

*Id.* at 36–37, 7 P.3d at 1073–74 (emphasis in original).

This court concluded, consistent with *Hui Alaloa*, that the "wholesale delegation of responsibility for the preservation and protection of native Hawaiian rights to [the developer], a private entity, [ ] was improper and misse[d] the point." *Id.* at 50, 7 P.3d at 1087. This court noted that "the LUC found that [the developer] 'will develop and implement' its RMP, which *'would in the future '*

coordinate development with native Hawaiian rights to coastal access for the purpose of traditional cultural practice." *Id.* at 51, 7 P.3d at 1088. This court concluded that the LUC's adoption of the developer's "conceptual" "future" study violated the LUC's duty to independently assess the impacts of the proposed reclassification on native Hawaiian customary and traditional practices, and delegated to the developer the authority to balance the needs of native Hawaiians against the developer's interests. *Id.* Significantly, this court noted:

> Specific considerations regarding the extent of customary and traditional practices and the impairment and feasible protection of those uses must first be made before a petition for a land use boundary change is granted. The power and responsibility to determine the effects on customary and traditional native Hawaiian practices and the means to protect such practices may not validly be delegated by the LUC to a private petitioner who, unlike a public body, is not subject to public accountability. Allowing a petitioner to make such after-the-fact determinations may leave practitioners of customary and traditional uses unprotected from possible arbitrary and self-serving actions on the petitioner's part.

*Id.* at 52, 7 P.3d at 1089.

Like *Hui Alaloa*, *Ka Pa'akai O Ka 'Aina* is distinguishable from the instant case. Unlike in *Ka Pa'akai O Ka 'Aina*, here, the City Council did not delegate the power to determine the effects on archaeological resources and the means to protect such resources to a private petitioner. *Cf. id.* Rather, that power remains with the SHPD and OIBC under the PA. Additionally, the City Council conditioned the issuance of "any development permit for the Project" on its receipt of documentation that a PA "to minimize and mitigate adverse effects on historic properties as generally described in the Final [EIS] has been executed." As noted *supra*, the final EIS stated:

> The City will develop an [AIS] plan for the [area of potential effects] for each construction phase in accordance with [36 C.F.R. § 800.4] which allows for phased

identification of archaeological resources to limit disturbance of potential resources during the investigation.... The AIS plans will follow the requirements of HAR [c]hapter 13–276. The City will conduct the archaeological fieldwork as presented in the AIS plan for each construction phase. The archaeological fieldwork will be completed in advance of the completion of the final design so that measures to avoid and/or minimize adverse effects to the historic properties can be incorporated into the design. The City has consulted and continues to consult with SHPD and OIBC on burial issues.... *To balance the current level of project design, the desire to limit disturbance of native Hawaiian burials and residences in Phase [4] of the project area, and the potential transportation benefits that would accrue from the proposed project, FTA, in consultation with the parties, decided to develop a detailed approach in the ... draft PA for conducting archaeological investigations for Phase [4] of the project.* The City has committed to conducting archaeological investigations in locations where foundations will be placed. This would limit the area disturbed for archaeological investigations and construction to potentially less than 10 percent of what would be disturbed if archaeological investigations were conducted for 100 percent of the alignment. The City's proposed schedule for the Project would have construction starting in 2013 for Phase [4] (in the Kaka'ako neighborhood). Although, the development of more detailed design and, therefore, archeological investigations for the last construction phase would have typically been delayed until closer to the anticipated construction start date, the City has committed to starting the process much earlier.

(Emphasis added).

A draft PA was appended to the final EIS, which described the "archaeological historic property and resource identification and evaluation effort, as well as the mitigation procedures for identified archaeological resources."

The detailed provisions contained in the draft PA go well beyond the "conceptual" "future" study that this court concluded violated the LUC's duty to independently assess the impacts of the proposed reclassification on native Hawaiian customary and traditional practices in *Ka Pa'akai O Ka 'Aina. Id.* at 51, 7 P.3d at 1088. Thus, Kaleikini's reliance on *Ka Pa'akai O Ka 'Aina* is unpersuasive.[37]

Accordingly, the circuit court did not err in granting summary judgment in favor of the City and State on Count 6 of Kaleikini's complaint.

### E. The circuit court did not abuse its discretion in denying Kaleikini's HRCP Rule 56(f) motion

■ Kaleikini argues that the circuit court should have given her "a reasonable amount of time to pursue discovery." For the reasons set forth below, this argument is without merit.

HRCP Rule 56(f) permits a court to order a continuance to allow a party opposing a motion for summary judgment to obtain affidavits, depositions or discovery, where the party "cannot for reasons stated present by affidavit facts essential to justify the party's opposition[.]" A request for a continuance pursuant to HRCP Rule 56(f) "must demonstrate how postponement of a ruling on the motion will enable [the moving party], by discovery or other means, to rebut the movant's showing of absence of a genuine issue of fact." *Josue,* 87 Hawai'i at 416, 958 P.2d at 538 (brackets omitted).

In the instant case, Kaleikini requested a continuance in her opposition to the City's motion to dismiss and/or for summary judgment. Kaleikini's request stated, in its entirety, as follows:

[Kaleikini] agrees with the City that this Court should not convert the City's motion to dismiss to one for summary judgment. If this Court were to consider the City's motion as one for summary judgment, then this Court should give [Kaleikini] sufficient

37. Kaleikini also refers to provisions of HRS chapter 6E that concern the public trust. However, she does not articulate a cognizable argument as to how the public trust relates to her argument under HRS chapter 205A. Accordingly, we do not address public trust principles.

time to pursue discovery and obtain admissible evidence.

(Citations omitted).

Accordingly, Kaleikini's request did not demonstrate how postponement of a ruling on the City's motion would enable her, "by discovery or other means, to rebut the movant's showing of absence of a genuine issue of fact." *Josue*, 87 Hawai'i at 416, 958 P.2d at 538. Similarly, in her opening brief, Kaleikini argues only that HRCP Rule 56(f) "should be liberally construed particularly when the non-moving party has not had an adequate opportunity to conduct discovery." (Citation omitted). Kaleikini argues that a continuance was warranted because "the [City's] motion was filed a week after service" and she "could not obtain any discovery responses until . . . the same day that the hearing on the City's motion for summary judgment was scheduled." Again, however, Kaleikini did not explain how the discovery responses would rebut the City's showing of an absence of a genuine issue of material fact. *See Josue*, 87 Hawai'i at 416, 958 P.2d at 538.

Accordingly, because Kaleikini failed to meet this burden, the circuit court did not abuse its discretion in denying her HRCP Rule 56(f) request for a continuance.

## IV. Conclusion

For the foregoing reasons, the circuit court erred in granting summary judgment in favor of the City and State on Counts 1 through 4 of Kaleikini's complaint, because the rules implementing HRS §§ 6E–8 and 6E–42 do not permit the SHPD to concur in the rail project absent a completed AIS for the entire project. However, the circuit court properly granted summary judgment in favor of the City and State on Counts 5 and 6 because (1) the final EIS was sufficient under HRS chapter 343 and was properly accepted by the Governor; and (2) the City and State gave full consideration to cultural and historic values as required under HRS chapter 205A.

Accordingly, we vacate the circuit court's judgment on Counts 1 through 4, and remand for further proceedings. However, we affirm the circuit court's grant of summary judgment in favor of the City and State on Counts 5 and 6.